NUMBER 13-98-254-CV 



COURT OF APPEALS 



THIRTEENTH DISTRICT OF TEXAS 



CORPUS CHRISTI 

___________________________________________________________________ 



TRT DEVELOPMENT COMPANY-KC, 

SHORELINE OPERATING COMPANY, 

AND WYNN CHAPMAN , Appellants, 



v. 



MARK MEYERS , Appellee. 

___________________________________________________________________ 



On appeal from the 319th District Court 

of Nueces County, Texas. 

___________________________________________________________________ 



O P I N I O N 



Before Justices Dorsey, Hinojosa, and Chavez 

Opinion by Justice Dorsey 



Appellants TRT Development Company-KC, Shoreline Operating Company, and Wynn Chapman appeal a judgment
rendered on a jury verdict that they are liable to Mark Meyers for defamation. By four issues appellants challenge the legal
and factual sufficiency of the evidence to support the verdict. Meyers raises four cross-issues for our consideration. We
reverse and render. 

Factual Background 

On Sunday May 19, 1996 Valero Refining Company held its annual family day picnic and golf tournament at the Kings
Crossing Golf and Country Club located in Corpus Christi. Mark Meyers, an employee of Valero, played in the tournament
with a group of three other Valero employees. After the tournament Meyers went into the Kings Crossing pro shop and
gave his score card to Chad Salerno and Mark McCarthy, both of whom worked in the pro shop. Meyers stayed in the pro
shop to look at the merchandise, and Salerno went to the pool area. Salerno returned about twenty minutes later and saw
that Meyers was still in the pro shop, standing behind a display rack. About five minutes later Salerno walked towards
Meyers and noticed that he had bulges in the pockets of his shorts. When Meyers first entered the pro shop Salerno did not
recall seeing anything in his pockets. As Salerno approached, Meyers turned, walked away, and left the pro shop. As
Meyers was leaving Salerno heard hangers rattling where Meyers had been standing. After Salerno found some empty shirt
hangers where Meyers had been standing he and McCarthy followed Meyers to his truck, which was parked in the parking
lot. McCarthy testified that when he followed Meyers into the parking lot Meyers "had his hands kind of cupped around his
shorts, holding them up, and they were bulging out." While Meyers was in his truck Salerno and McCarthy asked him if
they could see what was in his pockets. Meyers ignored them and closed the door. He backed up without removing the sun
screen from his windshield and drove away. 

After Meyers' departure Salerno discovered his name by questioning the three persons who had played golf in the same
group with Meyers that day. Shortly thereafter the pro shop employees reported Meyers' behavior to Wynn Chapman, the
general manager of Kings Crossing. A short time later Chapman had a private meeting in his office with Robert Grimes.
Grimes was at Kings Crossing for the event and worked as Valero's manager of employee relations and public affairs.
Concerning this meeting Grimes testified that Chapman had told him that Valero 

had one employee that was observed around the shirt rack for sometime; the employee left in a hurry; they observed two or
three shirts were missing from the rack; they approached the employee out in the parking lot, and he drove off in a hurry
without responding to their questions. 



During trial Meyers' counsel asked Grimes, "Based on those statements that he made to you at that time, was your
understanding that Mr. Chapman was telling you that there had been a theft by a Valero employee?" He replied, "Yes,
basically." Grimes understood from Chapman that Meyers was the employee suspected of the theft. 

The day after the incident Meyers told Grimes what had happened. Meyers admitted to being in the pro shop after the
tournament, that he left the pro shop, and that one or two Kings Crossing employees approached him in the parking lot.
Meyers said that an employee told him that he looked kind of fat. Meyers cussed at him and drove off. Meyers stated that
he had brought "koozies" to the tournament and had stuffed them in his pockets, thus accounting for the bulges there. He
denied taking anything from the pro shop. 

Valero sent its security supervisor, Gwen Henzi, to Kings Crossing to investigate the theft allegations, and also conducted
an in-house investigation. Henzi's investigation did not determine that Meyers had stolen anything from the pro shop. The
in-house investigation showed that Meyers had been drinking alcoholic beverages during the tournament and that he was
"kind of loud and rowdy" during the tournament. People who played golf on the course said that Meyers was intoxicated.
For disciplinary reasons Valero suspended Meyers for ten days without pay. Valero also requested that he undergo
substance-abuse evaluation. Grimes' testimony was that Meyers was not punished for being accused of a theft. In June 1997
Valero fired Meyers because he had filed a lawsuit(1) against Valero and because he had recorded telephone conversations
with Valero employees. 

Meyers sued TRT Development Company-KC,(2) Shoreline Operating Co.,(3) and Wynn Chapman (collectively appellants)
for tortious interference with his employment contract with Valero and for defamation. Meyers claimed that Wynn
Chapman and Chad Salerno had made defamatory statements about him. The case proceeded to jury trial and resulted in
jury findings that only Chapman had made defamatory statements about Meyers, that Chapman's statements were not made
with actual malice, and that appellants did not tortiously interfere with Meyers' contract. The jury awarded Meyers
$54,239.50 in lost wages. 

On February 18, 1998 the court signed the judgment awarding $54,239.50 to Meyers. Appellants appeal from this
judgment. 

Wynn Chapman's 

Statements to Robert Grimes 



By their second issue appellants assert that the evidence showed as a matter of law that Wynn Chapman's statements to
Robert Grimes are qualifiedly privileged and therefore not actionable. In its answer to question one the jury found that
Chapman's statements to Grimes in Chapman's office were defamatory. 

Appellants filed a motion for judgment n.o.v., contending that they had established qualified privilege as a matter of law.
The trial court denied the motion. A trial court should grant a motion for judgment n.o.v. when the evidence is conclusive
and one party is entitled to judgment as a matter of law. City of Dallas v. GTE Southwest, Inc., 980 S.W.2d 928, 938 (Tex.
App.--Fort Worth 1998, writ denied). See Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227 (Tex. 1990). 

Slander is a defamatory statement that is orally communicated to a third person without legal excuse. Randall's Food
Markets, Inc. v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995); Hardwick v. Houston Lighting & Power Co., 881 S.W.2d 195,
197 (Tex. App.--Corpus Christi 1994, writ dism'd w.o.j.). Slanderous statements are conditionally or qualifiedly privileged
and therefore not actionable when "made in good faith on any subject matter in which the author has an interest, or with
reference to which he has a duty to perform to another person having a corresponding interest or duty." Rogers v. Cassidy,
946 S.W.2d 439, 447 (Tex. App.--Corpus Christi 1997, no writ); Associated Tel. Directory Publishers, Inc. v. Better Bus.
Bureau of Austin, Inc., 710 S.W.2d 190, 192 (Tex. App.--Corpus Christi 1986, writ ref'd n.r.e.). 

An interest giving rise to a qualified privilege may be that of the publisher of the communication, the recipient of the
communication, or a third person. Pioneer Concrete of Texas, Inc. v. Allen, 858 S.W.2d 47, 50 (Tex. App--Houston [14th
Dist.] 1993, writ denied); Kaplan v. Goodfreed, 497 S.W.2d 101, 105 (Tex. Civ. App.--Dallas 1973, no writ).
Communications given voluntarily, as in this case, rather than in response to a request for information, are privileged "if the
relationship between the parties is such that it is within generally accepted standards of decent conduct to furnish the
information for the protection of the interest of the recipient." Allen, 858 S.W.2d at 50; Kaplan, 497 S.W.2d at 105-06. 

The speaker abuses the privilege if he makes a statement with actual malice. Grant v. Stop-N-Go Market of Texas, Inc., 994
S.W.2d 867, 874 (Tex. App.--Houston [1st Dist.] 1999, no writ). Even a communication on a privileged occasion that
would otherwise be slanderous per se is qualifiedly or conditionally privileged and not actionable, unless the defendant was
actuated by malice. Wal-Mart Stores, Inc. v. Odem, 929 S.W.2d 513, 525 (Tex. App.--San Antonio 1996, writ denied). In
the defamation context a speaker makes a statement with actual malice if he makes the statement with knowledge of its
falsity or with reckless disregard about its truth. Randall's Food Markets, 891 S.W.2d at 646; Hagler v. Proctor & Gamble
Mfg. Co., 884 S.W.2d 771, 772 (Tex. 1994) (per curiam). Reckless disregard is defined as a high degree of awareness of
probable falsity, for proof of which the plaintiff must present sufficient evidence to permit the conclusion that the defendant
in fact entertained serious doubts about the truth of his publication. Carr v. Brasher, 776 S.W.2d 567, 571 (Tex. 1989). The
privilege is also abused if the person claiming it does not act for the purpose of protecting the common interest. Grant, 994
S.W.2d 874; Hardwick, 881 S.W.2d at 199. 

Privilege is an affirmative defense, and the defendant has the burden of proving that the communication is privileged.
Denton Publishing Co. v. Boyd, 460 S.W.2d 880, 881, 884 (Tex. 1970). When the facts are undisputed and the language
used in the publication is not ambiguous the question of privilege is ordinarily one of law for the court. Denton Publishing
Co., 460 S.W.2d at 884. See Dixon v. Southwestern Bell Tel. Co., 607 S.W.2d 240, 241 (Tex. 1980). 

The evidence is undisputed that on May 19, 1996, Valero held its family day picnic and golf tournament at Kings Crossing.
Valero had paid and contracted with Kings Crossing to use its facilities. Meyers was a Valero employee and played in the
golf tournament. Chapman was Kings Crossing's general manager and was ultimately responsible for what happened in the
pro shop. Shortly after the tournament Kings Crossing's employees reported to Chapman a suspected theft of golf shirts
from the pro shop committed by Meyers. Chapman communicated the reported incident to Valero through Grimes.
Chapman believed that the statements he made to Grimes were true. 

Because Chapman was the general manager of Kings Crossing with ultimate responsibility for what happened in the pro
shop, he had an interest in the subject matter of his communications to Grimes, that is, the report of a theft from the pro
shop by a Valero employee. Grimes, as Valero's manager of human relations and public affairs, had a corresponding
interest in knowing that a Valero employee was probably involved in a theft while participating in a company-sponsored
event. Knowledge of these facts would allow Valero to investigate the theft, discipline Meyers if necessary, and pay(4)Kings
Crossing for the missing shirts, so that Valero could promote and maintain its relationship with Kings Crossing. Grimes
testified that "we were glad" that Chapman had informed Valero about the incident. Grimes also testified, "If something
similar to . . . [this] incident happens when we're a guest at a facility like that, we want to know about it. . . ." Eugene
Cotten, a vice-president for Valero, testified that "Valero is always concerned about the actions of our employees." 

Appellants established that Chapman's statements to Grimes were qualifiedly privileged because the evidence conclusively
showed that Chapman made the statements to Grimes on a subject in which they had a common interest. See Rogers, 946
S.W.2d at 447; Associated Tel. Directory Publishers, 710 S.W.2d at 190. Given the relationship between Kings Crossing
and Valero, it was within generally accepted standards of decent conduct for Chapman to tell Grimes for the protection of
Valero's interests. SeeAllen, 858 S.W.2d at 50; Kaplan, 497 S.W.2d at 105-06. 

The jury found that Chapman did not act with malice when he made the statements to Grimes. The record is devoid of any
evidence that Chapman knew the statements were false or that he made them with reckless disregard about their truth when
he reported Meyer's actions to Grimes. The evidence showed as a matter of law that Chapman's statements were protected
by qualified privilege that was not overcome by actual malice. Appellant's second issue is sustained. 

As the resolution of this issue is dispositive of appellants' appeal we need not address their remaining issues. See Tex. R.
App. P. 47.1. 

The Cross Appeal 

By his first issue Meyers asserts that the jury's failure to find that Chad Salerno's statements were defamatory is against the
great weight and preponderance of the evidence. In its answer to question one the jury found that Salerno's statements to the
"Valero employees" were not defamatory. 

In reviewing a factual sufficiency point an appellate court must weigh all of the evidence in the record. Ortiz v. Jones, 947
S.W.2d 770, 772 (Tex. 1996) (per curiam); Burnett v. Motyka, 610 S.W.2d 735, 736 (Tex. 1980). Findings may be
overturned only if they are so against the great weight and preponderance of the evidence that they are clearly wrong and
unjust. Ortiz, 947 S.W.2d at 772; Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). In Pool v. Ford Motor Co., 715 S.W.2d
629 (Tex. 1986) the court stated that the appellate court must also "clearly state why the jury's finding is factually
insufficient or is so against the great weight and preponderance as to be manifestly unjust." Pool, 715 S.W.2d at 635. 

The evidence showed that after Meyers left the Kings Crossing parking lot Salerno discovered his name by questioning the
Valero employees who had played golf in the same group with Meyers that day. Salerno described Meyers' truck to the
employees and asked who it belonged to. One of the persons in the group asked Salerno why he was asking this. Salerno
testified that "I told him that . . . items on the hangers were missing where Mr. Meyers was standing, and that we needed to
ask him some questions." 

The charge instructed the jury on the defense of truth as follows: "You are instructed that truth is a complete defense to
defamation. If the statements made are literally true, they are not slanderous or defamatory." 

Truth is an affirmative and absolute defense to slander. Randall's Food Markets, 891 S.W.2d at 646; Town of S. Padre
Island v. Jacobs, 736 S.W.2d 134, 140 (Tex. App.--Corpus Christi 1986, writ denied). In Randall's the court said that a
"literally true" statement is a "complete defense" to slander. Randall's Food Markets, 891 S.W.2d at 646; Washington v.
Naylor Indus. Servs., Inc., 893 S.W.2d 309, 311 (Tex. App.--Houston [1st Dist.] 1995, no writ). The implications of a true
statement, however unfortunate, do not vitiate an affirmative defense of truth. Hardwick, 943 S.W.2d at 185. Because truth
is an affirmative defense, the defendant has the burden of establishing that the defamatory statements were true. Knox v.
Taylor, 992 S.W.2d 40, 54 (Tex. App.--Houston [14th Dist.] 1999, no writ); Town of S. Padre Island, 736 S.W.2d at 140. 

The evidence was that when Meyers entered the pro shop, Salerno did not recall seeing anything in his pockets. Meyers
remained in the pro shop for twenty to thirty minutes. Salerno saw him standing behind a display rack. When Salerno
approached Meyers he went in the opposite direction and left the pro shop. Salerno saw bulges in the pockets of Meyers'
shorts and found empty shirt hangers in the area where he was standing. This evidence establishes the literal truth of
Salerno's statement to the Valero employees. We hold that the jury's answer was not so against the great weight and
preponderance of the evidence that it was clearly wrong and unjust. We overrule the first cross issue. 

By his fourth cross issue Meyers asserts that appellants tortiously interfered with his employment contract with Valero. In
its answer to question six the jury found that Shoreline Operating Company and Wynn Chapman did not intentionally
interfere with Meyers' employment contract with Valero. 

The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful
and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss. Powell Indus.,
Inc. v. Allen, 985 S.W.2d 455, 456 (Tex. 1998) (per curiam). See ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430
(Tex. 1997). In the instant case the testimony was that Valero suspended Meyers for ten days without pay because he had
consumed alcoholic beverages during the golf tournament and he was loud and rowdy on the golf course. Valero terminated
Meyers in June 1997 because he had filed suit against Valero and because he had secretly tape recorded telephone
conversations between himself and other Valero employees. Eugene Cotten was Meyers' supervisor at Valero. He testified
that the possible theft of shirts from the pro shop was not a factor in Valero being upset with Meyers, and that the actions
taken by Valero against Meyers were not due to the alleged theft of the shirts. The evidence does not establish that
appellants' complaint about the missing shirts proximately caused any damages to Meyers. We hold that the jury's answer to
question six was not so against the great weight and preponderance of the evidence that it was clearly wrong and unjust.
We overrule the fourth cross-issue. 

Due to our disposition of the above cross-issues we need not address Meyers' remaining cross-issues. See Tex. R. App. P.
47.1. 

We REVERSE the judgment of the trial court and RENDER judgment that Mark Meyers take nothing by his suit against
appellants. 



______________________________ 

J. BONNER DORSEY, 

Justice 



Publish . 

Tex. R. App. P. 47.3(b). 



Opinion delivered and filed 

this 23rd day of March, 2000. 

1. Meyers settled his suit against Valero for $3,000. 

2. TRT Development Company owned the Kings Crossing facilities when the incident happened in May, 1996. 

3. Shoreline Operating Company managed the Kings Crossing facilities at the time. 

4. Valero paid for the missing shirts.