COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

RICHARD ROSEN, INC.,                                   )

                                                                              )             
No.  08-04-00077-CV

Appellant,                          )

                                                                              )                   Appeal from the

v.                                                                           )

                                                                              )              
171st District Court

FERNANDO MENDIVIL, JR.,                            )

                                                                              )          
of El Paso County, Texas

Appellee.                           )

                                                                              )                   (TC# 96-2579)

 

 

O
P I N I O N

 

Appellee Fernando
Mendivil sued his former employer, Richard Rosen, Inc., and its 








vice-president Kirk Sales for
intentional infliction of emotional distress and defamation based on their
conduct leading to and after the end of Mr. Mendivil=s
employment with the company.[1]  The jury found in favor of Mr. Mendivil on
both causes of action.  The defendants
filed a motion for judgment notwithstanding the verdict (AJNOV@)
and after a hearing, the trial court took the motion under advisement.  The trial court granted the JNOV with respect
to the punitive damages award as to Mr. Sales. 
The trial court then rendered judgment on the verdict and awarded
Mr. Mendivil $290,120 in actual damages and $25,000 in exemplary damages,
plus costs and interest.  In three
issues, Appellant Richard Rosen, Inc. contends the trial court erred in denying
its amended motion for JNOV because there was no evidence to support Mr.
Mendivil=s causes
of action or the award of exemplary damages. 
We affirm the trial court=s
judgment in part and reverse and render in part.

From 1992 to 1995,
Appellant operated numerous retail stores in Texas and New Mexico.  In late August 1992, a former employer of Mr.
Mendivil recommended him for a managerial position with Appellant.  Mr. Mendivil had previously managed a clothing
store in El Paso.  Mr. Mendivil
interviewed with the owner Richard Rosen,[2]
Mark Rosen, and Kirk Sales and was subsequently hired.

In November 1992,
Mr. Mendivil started employment with Appellant as a supervisor for the company=s stores in New Mexico.  Mr. Mendivil moved to Santa Fe, New Mexico
for the job.  He was to receive a salary,
a ten percent bonus or commission based on the gross profits for each store he
supervised, an apartment, and sometime in the future, a van.  Mr. Mendivil reported to Kirk Sales, the vice
president of the company.  To start, Mr.
Mendivil made some quick changes to the Santa Fe store and the holiday season
went very well.  He then took over
supervision of the Las Vegas store and increased sales at that store after
remodeling it.  By 1994, Mr. Mendivil was
supervising six stores in New Mexico.  In
March 1995, the company issued a memorandum formally announcing Mr. Mendivil=s position as the immediate supervisor
of the company=s New
Mexico operations.  The memorandum
praised Mr. Mendivil as having Aa
good track record@ and for
being a Ahard
worker.@








Mr. Mendivil
traveled between the New Mexico stores on a weekly basis, to delegate certain
tasks and to see how each store was progressing.  When he traveled between the stores, Mr.
Mendivil would also transport special orders, and certain products to balance
out inventory.  Mr. Mendivil was required
to attend weekly management meetings in El Paso.  Six months after he started with the company,
Mr. Sales and Mr. Rosen offered to buy Mr. Mendivil a car, but he suggested
that they buy him a van so that he could move products between the stores as
needed.  The company purchased a 1994
Chevy Astro Van for Mr. Mendivil=s
use and it reimbursed his gas and maintenance costs.

After March 1995,
Mr. Mendivil began having communication problems with Mr. Sales and Mr. Rosen
following a disagreement about the sales strategy for the fabric
department.  In April, Mr. Mendivil began
to have additional problems with Mr. Sales and Mr. Rosen because they
wanted to cut back on mailing costs.  In a
letter to Mr. Mendivil, Mr. Rosen complained about the need to cut
expenses and criticized Richard Garcia, the manager of the Alamogordo
store.  Mr. Mendivil received more
letters similar to the April letter from Mr. Rosen.  In addition, Mr. Rosen reversed changes
that Mr. Mendivil had made in remodeling the stores.  Mr. Mendivil decided to resign from the
company because he felt he was not getting cooperation from Mr. Rosen and
Mr. Sales.  Prior to making his decision
to resign, he had no indication that they had any intention to fire him.








Mr. Mendivil met
with Mr. Sales on June 10, 1995 at the Santa Fe store.  He told Mr. Sales that he planned to
resign.  Mr. Sales asked him why and Mr.
Mendivil explained to him he was not getting cooperation from Mr. Rosen,
particularly with regard to the remodeling changes he had ordered.  Mr. Sales as was his custom, reminded Mr.
Mendivil about being the highest paid employee and having a van, as his company
perk.  Mr. Mendivil told him that up
until then, he had done a very good job in the stores, had increased sales, and
trained good managers, but felt it was better that he move on because he did
not want it to become a bad situation between them.  Mr. Mendivil said he would stay on to do the
inventory and then settle up on his bonuses. 
Mr. Sales thanked Mr. Mendivil for wanting to stay on to do all the
inventory, praised him for his work, and promised to give him a good
recommendation.  During their
conversation, Mr. Mendivil mentioned the company van because they had bought
the van for him after he Aran
[his] truck into the ground.@  Mr. Sales told Mr. Mendivil that he would
talk to Mr. Rosen and work out a deal. 
He and Mr. Sales agreed that the resignation would be effective August
1.

In his deal with
Mr. Sales, Mr. Mendivil gave his notice of resignation, but wanted to settle up
on the bonus, which was based on the inventory taken of all the stores.  Mr. Sales told Mr. Mendivil that it would
take until August 1 to tabulate the inventory, so the date of August 1 was
chosen for purposes of settling up the bonus and also Mr. Mendivil would have
time to finish remodeling the stores.

Mr. Mendivil and
Mr. Sales telephoned Mr. Rosen and informed him that AFernie
just resigned.@  Mr. Sales gestured to Mr. Mendivil to leave
so he could continue the conversation in private and Mr. Mendivil left the room
to continue preparing the store for inventory that afternoon.  According to Mr. Mendivil, no one ever told
him that he was abusive, he never was told he was a bully, and they never told
him of any complaints against him.








On June 26, 1995,
Mr. Mendivil had a conversation with Mr. Sales at the store in El Paso on the
sales floor.  Mr. Mendivil was there to
pick up some merchandise to take back to Santa Fe on his return.  Mr. Sales suggested that they move up the
date that he was suppose to be leaving because it might be better for the
company.  Mr. Mendivil reminded him that
they had made an agreement and told him that he had already set up his schedule
based on that date and it would be an inconvenience.  Mr. Sales said A[a]ll
right@ and A[w]e=ll
go discuss it with [Mr. Rosen].@  Mr. Rosen, however, had already left
that day.  Mr. Mendivil tried to talk to
Mr. Rosen on June 27, but Mr. Rosen had gone out to his ranch.

On June 28, Mr.
Mendivil spoke with Mr. Rosen.  By that
time all the physical inventories of the New Mexico stores were complete.  Mr. Mendivil went to Mr. Rosen=s office and told him that Mr. Sales
had mentioned to him the other day that he was thinking about changing his
leaving date.  Mr. Mendivil reminded Mr.
Rosen that they had agreed upon the August 1 leaving date.  He also told him that it was only fair that
Mr. Rosen honor the agreed upon date since he had not left them hanging with
inventories and so forth.  Mr. Rosen
agreed and then questioned him about why he was leaving.  Mr. Rosen tried to talk Mr. Mendivil out of
leaving, told him that he would call him, and said AI
think we can fix all of this.@

Two days later,
Mr. Mendivil wrote a letter to Mr. Rosen. 
In the letter, Mr. Mendivil stated the following in part:

As you are well aware,
I gave notice to resign as supervisor of your stores, on Sat. June 10th.  I explained to you that my reason was that I
felt I was being forced to resign by you, because of lack of your support from
you as owner of this company.  I felt it
impossible to do my job properly as I have been, without this support which you
had shown me in the previous years.  In
addition, the constant references by Kirk Sales made toward paying me the
highest salary in the company and paying for my apartment and that [the]
company bought me a van.  This plication
[sic] that I wasn=t worth
these expenses and constant harassment about this, was to much to be dealing
with.  I believe the van was to haul
merchandise from store to store, or do I get to keep it?

 

My resignation was
accepted by Mr. Kirk Sales.  After
discussion, we both agreed my last day of employment would be 8/1/95.  I offered to stay and complete the year end
inventories and releave [sic] Robert Garcia during his vacation.  In addition it would give Kirk enough time to
finish the year end finacial [sic] statements. 
Kirk thanked me and accepted this very fair notice.  He said he was very appreciative of my effort
to make a smooth transition.








On Monday, 6/26/95,
Kirk and I again discussed my departure. 
He stated that you all had discussed my leaving and felt it best I leave
at once.  I stated that I had made up my
schedule and plans to leave on 8/1/95, as previously agreed.  I told him it was not very fair to displace
me in this manner, since he had accepted the time table we discussed on Sat.
June 10th; when I first gave him my resignation.  I tryed [sic] to finish our discussion, but
he was too busy on the phone with Phil. 
He suggested I talk to you, but you had left the building.  I again tryed [sic] to talk to you on Tues.
6/27/95, but he told me you were at >the
ranch.=  When you and I finally were able to talk on
Wed. 6/28/95, I was able to explain why I felt you were forcing me to resign,
but you had to leave before we discussed my departure date etc.  You asked for my home phone number and said
you would call, but never did.

 

At this writing, I am
not sure what you actually want me to do!

 

Mr. Mendivil also requested that
they meet to discuss how he should account for his time through August 1 as
well as severance-related matters.  Mr.
Mendivil received no response to the June 30 letter.

On about July 1,
Mr. Mendivil began to hear rumors from other employees of the company that he
had been fired.  He told them that he had
resigned and that they had misunderstood the news of his resignation.  Mr. Mendivil decided to fax a letter to all
store managers as well as to Mr. Rosen. 
The July 1 letter stated in part:

There have been
incorrect rumors spread, that I have been fired by Mr. Richard Rosen.  Employees at several stores have stated that
they recieved [sic] a call from Mr. Rosen himself.  This incorrect and damaging and vicious
rumors are very damaging to my character. 
I would like to correct this by making you aware of the truth!  I resigned on 6/10/95.  I gave notice to Mr. Kirk Sales that my last
day would be 8/1/95, and he agreed and accepted this date.  If there is any change to this date, it will
be at the request of Mr. Rosen, and new arrangements will be made.  I will honor my word to stay till 8/1/95 and
will make myself to you, available.

 

No one in the company contacted Mr.
Mendivil about the July 1 letter.








Right before the
July 4 weekend, Mr. Mendivil received a message from the Santa Fe store manager
that he was wanted in El Paso on Monday. 
Mr. Mendivil packed up a few items of clothing and picked up some
merchandise to deliver to the Alamogordo store on his way to El Paso.  When Mr. Mendivil arrived at the store in
Alamogordo, the store manager, Richard Garcia, asked him what he was doing
there and told him Mr. Rosen said he had been fired.  Mr. Mendivil was shocked by Mr. Garcia=s statement and could not believe what
he was hearing.

According to Mr.
Garcia, Mr. Rosen called him that day and told him that Mr. Mendivil was no
longer with the company and had been fired. 
Mr. Garcia was shocked by the news and, at first, thought less of Mr.
Mendivil because Awhen
someone gets fired there=s
probably a reason for it.@  Mr. Garcia recalled that Mr. Mendivil
wondered aloud how Mr. Garcia could know about this before he did.  They unloaded the van and Mr. Mendivil
continued on his way to El Paso.

When Mr. Mendivil
arrived in El Paso, Mr. Sales told him that they had decided it was better for
the company for him to leave immediately. 
Mr. Sales demanded the keys to the van, which caught Mr. Mendivil
off-guard.  Mr. Mendivil reminded him
that they had agreed he would stay on until the inventories were tabulated and
that he was leaving August 1. 
Mr. Mendivil stated that he fulfilled his part of the agreement by
staying and performing the inventory.  In
a loud voice, Mr. Sales said he wanted the van. 
This occurred inside the store on the sales floor where there were
people around.  Employees were staring at
Mr. Mendivil.  Mr. Mendivil was
shocked by Mr. Sales=
loud demand for the keys to the van.  He
explained that he came to El Paso in the van and had no way to get back to
Santa Fe.  According to
Mr. Mendivil, Mr. Sales=
response was AWell, it=s our van.  And if you don=t
give me the van -- if you don=t
give me the keys to the van, I=m
going to call the police.@








Mr. Mendivil
pleaded with Mr. Sales to give him an hour to make transportation
arrangements.  Finally, Mr. Sales
relented and agreed to the one-hour delay. 
Mr. Mendivil went to his mother=s
house and asked her to follow him back downtown so he could drop off the
van.  He told her that they were taking
the van away from him.  He also told her
that he had to take it back now or else they would call the police.

Mr. Mendivil
returned to the store, parked out front, and went inside to look for
Mr. Sales.  Mr. Sales inspected the van
inside and out.  While at his mother=s house, Mr. Mendivil had prepared
a receipt for Mr. Sales to sign stating that he had returned the company van in
good order.  Mr. Sales became angry when
Mr. Mendivil asked him to sign the receipt. 
Mr. Sales began yelling and refused to sign anything.  Mr. Mendivil told him that he would not give
him the van unless he signed for it.  Mr.
Sales again threatened to call the police unless Mr. Mendivil gave him the
keys.  They were on the sidewalk in front
of the store and passers by were witnessing the confrontation.  Mr. Mendivil felt humiliated because Mr.
Sales= threats
made it seem as if he was robbing him. 
Mr. Mendivil=s mother
became embarrassed, very upset, and returned to her car and started
crying.  The confrontation lasted a few
minutes before Mr. Mendivil decided to go inside the store to find an employee
who could look at the van and confirm that it was in good condition.  After the employee said it looked like a good
van, Mr. Mendivil turned over the keys to Mr. Sales.

Mr. Mendivil
returned home with his mother.  He felt
traumatized and thought it was outrageous to have to go through something like
that.  His mother was crying and he tried
to calm her down.  She was worried
because Mr. Sales had said he was going to call the police.  He tried to reassure her that everything was
going to be okay and not to worry. 
According to his mother, Mr. Mendivil looked very distraught and very
pale after the incident.








The false
statements about Mr. Mendivil being fired by Richard Rosen, Inc. continued
after July 5.  According to Mr. Garcia,
six to eight weeks after July 1995, store managers continued to discuss their
understanding that Mr. Mendivil had been fired. 
Henry Hinijosa, a store manager, heard that Mr. Mendivil had been fired
from Mr. Rosen himself, possibly as late as February 1996.

Mr. Mendivil heard
that he had been fired from acquaintances he met in Santa Fe and continued to
hear the rumor for six to eight months as he applied for other positions in New
Mexico.  In networking for new
employment, Mr. Mendivil contacted several sales representatives who had
previously approached him after seeing what he had done for Richard Rosen,
Inc.  One of the companies was Western
Warehouse, which operates several stores in New Mexico.  In late July, Mr. Mendivil contacted their
sales representative so that this contact could set up a meeting with upper
management and let them know he was now available.  The representative told Mr. Mendivil, AI heard that you had gotten fired.@ 
The representative did not want to set up the interview because he did
not think they were going to be interested and also because they sold products
to the company.  Mr. Mendivil received
similar responses from other sales representatives in New Mexico, including a
jeans company, Laredo boots, and a hat salesman.  Mr. Mendivil found that after his employment
ended with Richard Rosen, Inc., no one would hire him and his sales
representative contacts did not want to get involved and were no longer
interested in him.








Felipe Martinez, a
Santa Fe restaurant owner, testified that Mr. Mendivil was a patron of his
business and a friend since 1993.  In
July 1995, Mr. Martinez heard that Mr. Mendivil had been fired from Delia
Sandoval, a commercials sales representative for a Spanish television station.  That same day, Mr. Mendivil showed up for
lunch and Mr. Martinez told him that he heard he was fired.  Mr. Mendivil looked distraught, unhappy, and
a little upset about it.  He walked out
of the restaurant without taking his food or offering an explanation.  Mr. Martinez stated that a lot of people were
around when he heard that Mr. Mendivil had been fired.  Mr. Mendivil testified that he also
heard from the owner of Foxes, a restaurant in Santa Fe, that he had been
fired.  A bunch of people in that
restaurant had also heard the rumor and when he entered one day, they were all
discussing it.  He tried to explain that
he had resigned and was not fired.

Mr. Mendivil could
not find employment in Santa Fe because it is a small community and no one would
hire him because they thought he had been fired.  Mr. Sales had promised him a recommendation
letter when he gave his notice of resignation on June 10.  Mr. Mendivil asked for one, but never
received it.  Mr. Mendivil felt that
without a favorable recommendation, he was not going to get a job.  Mr. Mendivil felt like he had been
fired.  He stayed in Santa Fe until the
end of the year and then moved back to El Paso. 
He did not start working again until he started his own business in
February 1996.








Mr. Mendivil
failed in his attempts to collect the vacation pay and the bonus commission
that Richard Rosen, Inc. owed him.  A few
days after the van incident, Mr. Mendivil met with Mr. Rosen, Mark Rosen, and
Mr. Sales to discuss the money owed to him. 
Mr. Sales said the company would give him his vacation pay if Mr.
Mendivil signed a release of all other liability, which he refused to do.  Mr. Sales also told Mr. Mendivil that in
terms of the bonus, he had already been paid everything that was due.  On February 20, 1996, Mr. Mark Rosen wrote a
letter to Mr. Mendivil stating that the company was maintaining its position
that the only amount owed to him was the vacation pay.  According to the letter, the company had
prepaid the fiscal year bonus to Mr. Mendivil.[3]  Mr. Mark Rosen=s
letter also accused Mr. Mendivil of threatening the company and reminded Mr.
Mendivil that a trade secret violation was a third degree felony.  In the letter, Mr. Mark Rosen threatened
criminal prosecution for the alleged extortion and stated that they were Aprepared to defend [their] position at
all cost.@

Mr. Mendivil
denied ever having threatened Mr. Mark Rosen and during the conversation
mentioned in the letter, Mr. Mendivil had only explained to Mr. Rosen why there
was an overstock on certain merchandise in the stores.  Mr. Mendivil found the letter to be outrageous
and also took offense at a comment in the letter that Mr. Mendivil was the
highest paid individual in the company because the company was again throwing
that in his face.  Kirk Sales testified
that for a time, Mr. Mendivil was the highest paid in the company and conceded
that they never paid him his vacation pay. 
According to Mr. Sales, the February 20 letter was a reply to Mr.
Mendivil=s request
for money that they did not feel he deserved.








When Mr. Mendivil
left the company on July 5, 1995, he was totally devastated.  He felt embarrassed, humiliated, very
depressed, and unhappy.  Mr. Mendivil was
dazed and could not think clearly.  He
thought Mr. Sales treated him badly that day and thought what Mr. Sales had
done to him was outrageous.  Mr. Mendivil
was also suffering because of the company=s
false statements about him being fired. 
He felt like he could not approach potential employers because everyone
was repeating the rumor that he had been fired. 
Mr. Mendivil had hoped to make a nice clean break with the company but
instead, he was not given time to network for a new job and was not given the
recommendation that Mr. Sales had promised him. 
Mr. Mendivil felt devastated by the way it had ended.  Mr. Mendivil also felt nervous because he had
a continuing obligation for his son=s
college education costs.  He felt like
all of a sudden he had been 

blind-sided.

With his
reputation ruined and no good recommendation, Mr. Mendivil felt that there was
no prospect of him obtaining a well-paying supervisory position.  For this reason, he felt devastated and lost.  He also felt like he was not going to be able
to accomplish anything.  On top of that,
Mr. Mendivil felt stranded in Santa Fe. 
It was almost unbearable.  The
apartment that the company paid for in Santa Fe was leased in Mr. Mendivil=s name. 
Richard Rosen, Inc. stopped paying the rent and Mr. Mendivil had to pay
for the remaining months left on the lease. 
In the six months that followed, Mr. Mendivil could not sleep.  His anguish affected his relationships with
his girlfriend and his son.  His
girlfriend left him and his relationship with his son was strained because of
the financial pressures he put on his son to finish college.








Mr. Mendivil
sought psychological counseling in 1998. 
He did not seek help earlier because he was internalizing the pain and
had never thought about seeing a professional. 
His attorney recommended Dr. Garry Feldman.  Mr. Mendivil was embarrassed to see Dr.
Feldman and never told anyone about the counseling.  Dr. Feldman testified that Mr. Mendivil was
suffering from moderate clinical depression. 
Dr. Feldman found that Mr. Mendivil=s
depression included physical symptoms like elevated blood pressure and
cholesterol levels.  Mr. Mendivil told
Dr. Feldman that he felt Ablack-balled@ by the ARosens@ because they had tainted his career
opportunities by spreading rumors about him. 
Mr. Mendivil told the doctor that he was taking his frustrations out on
his son and their relationship had became estranged.  Mr. Mendivil felt shell-shocked, numb, and
immobilized since the whole event.  Mr.
Mendivil also felt like a failure because of the way his former employer had
treated him.  Dr. Feldman determined with
reasonable psychological probability that Mr. Mendivil=s
termination and falling out with the Rosen company was the major cause of his
depression.  The other events subsequent
to the termination were contributing factors to that depression.

At trial, Mark
Rosen testified that Mr. Mendivil was not fired from the company.  He denied spreading rumors that Mr. Mendivil
had been fired.  He also denied telling
anyone, including any prospective employers, that Mr. Mendivil had been
fired.  Mr. Sales disputed
Mr. Mendivil=s
testimony concerning the effective date of his resignation.  Mr. Sales recalled mentioning to Mr. Mendivil
during the inventory process that the company had decided his leaving date
would be July 1, but Mr. Mendivil made no response.  Mr. Sales admitted that he had offered him a
recommendation letter when Mr. Mendivil resigned and had thanked him for the
advance notice.  Mr. Sales stated that he
found out that Mr. Mendivil was claiming that rumors were circulating through
his June 30 letter to the company.  On
July 5, Mr. Sales faxed a memo to all stores, notifying the store managers that
Mr. Mendivil had resigned and was no longer employed by the company effective
that day.  Mr. Sales agreed that a person=s reputation in the retail
merchandising industry was very important and that false statements about a
high level manager=s work
reputation would be extremely damaging. 
Mr. Sales denied ever telling anyone in the company or out in the public
that Mr. Mendivil was fired.

DENIAL
OF JNOV MOTION








In three issues,
Appellant contends the trial court erred in denying the amended motion for JNOV
because there is no evidence to support the jury findings on Mr. Mendivil=s causes of action for intentional
infliction of emotional distress and defamation and on the exemplary damages
award.

Standard
of Review

We review a denial
of a motion for JNOV under a legal sufficiency standard.  See Mancorp, Inc. v. Culpepper, 802
S.W.2d 226, 227-28 (Tex. 1990); Williams v. City of Midland, 932 S.W.2d
679, 682 (Tex.App.--El Paso 1996, no pet.). 
In our review of a Ano
evidence@ or legal
insufficiency point, we review the evidence in the light most favorable to the
jury=s
findings, considering only the facts and inferences that support them and
disregarding all evidence and inferences to the contrary.  See Bradford v. Vento, 48 S.W.3d 749,
754 (Tex. 2001); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).  If more than a scintilla of evidence supports
the finding, the Ano
evidence@ point
fails and the motion for JNOV was properly denied.  See Mancorp, Inc., 802 S.W.2d at 228; Tseo
v. Midland Am. Bank, 893 S.W.2d 23, 25 (Tex.App.‑-El Paso 1994,
writ denied).  The evidence supporting a
finding amounts to more than a scintilla if reasonable minds could arrive at
the finding given the facts proved in the particular case.  Burroughs Wellcome Co. v. Crye, 907
S.W.2d 497, 499 (Tex. 1995).








When, as here, a
party does not submit its affirmative defense to the jury, we review the record
to determine whether the issue was disputed or whether the defense was
conclusively established by the evidence as a matter of law.  See Whitney Nat=l Bank v. Baker, 122 S.W.3d 204,
207 (Tex.App.‑-Houston [1st Dist.] 2003, no pet.); see also Sterner v.
Marathon Oil Company, 767 S.W.2d 686, 690 (Tex. 1989).  A party attempting to overcome an adverse
fact finding as a matter of law must surmount two hurdles.  Sterner, 767 S.W.2d at 690.  First, the record must be examined for
evidence that supports the finding, while ignoring all evidence to the
contrary.  Id.  Second, if there is no evidence to support
the finding, then, the entire record must be examined to see if the contrary
proposition is established as a matter of law. 
Id.  Only if the contrary
position is conclusively established will the point of error be sustained.  Id. at 690-91.

Intentional
Infliction of Emotional Distress

In Issue One,
Appellant asserts that even when viewing the evidence in the light most
favorable to the jury=s
verdict, there is no evidence of extreme and outrageous conduct.  Rather, as a matter of law, Appellant=s conduct was not extreme and
outrageous and thus, Mr. Mendivil failed to establish his intentional
infliction of emotional distress claim.

To recover on an
intentional infliction of emotional distress claim, a plaintiff must prove
that:  (1) the defendant acted
intentionally or recklessly; (2) the conduct was extreme and outrageous; (3)
the defendant=s actions
caused the plaintiff emotional distress; and (4) that the resulting emotional
distress was severe.  Hoffmann-La
Roche, Inc. v. Zeltwanger, 144 S.W.3d 438, 445 (Tex. 2004); GTE
Southwest, Inc. v. Bruce, 998 S.W.2d 605, 611 (Tex. 1999); Dillard
Department Stores, Inc. v. Gonzales, 72 S.W.3d 398, 404 (Tex.App.--El Paso
2002, pet. denied).  Extreme and
outrageous conduct is conduct Aso
outrageous in character, and so extreme in degree, as to go beyond all possible
bounds of decency, and to be regarded as atrocious, and utterly intolerable in
a civilized community.@  Zeltwanger, 144 S.W.3d at 445, quoting
Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993).








To determine whether
certain conduct is extreme and outrageous, we consider the context and the
relationship between the parties.  See
GTE Southwest, Inc., 998 S.W.2d at 612; Tiller v. McLure, 121 S.W.3d
709, 714 (Tex. 2003)(per curiam).  A
claim for intentional infliction of emotional distress does not lie for
ordinary employment disputes.  GTE
Southwest, Inc., 998 S.W.2d at 612. 
Thus, to establish the cause of action in the workplace, an employee
must prove the existence of some conduct that brings the dispute outside the
scope of an ordinary employment dispute and into the realm of extreme and
outrageous conduct.  Id. at
613.  Likewise, post-termination conduct
may constitute intentional infliction if it goes Abeyond
all possible bounds of decency,@
but Aordinary@ post-termination disputes are
insufficient to support liability.  See
Creditwatch, Inc. v. Jackson, 157 S.W.3d 814, 817 (Tex. 2005).  When repeated or ongoing severe harassment is
shown, the conduct should be evaluated as a whole in determining whether it is
extreme and outrageous.  GTE
Southwest, Inc., 998 S.W.2d at 616.

It is for the
court to determine, in the first instance, whether a defendant=s conduct was extreme and
outrageous.  GTE Southwest, Inc.,
998 S.W.2d at 616.  But when reasonable
minds may differ, it is for the jury, subject to the court=s control, to determine whether, in the
particular case, the conduct was sufficiently extreme and outrageous to result
in liability.  Id.

Mr. Mendivil
argues that when all the evidence and surrounding circumstances are considered as
a whole, the evidence was legally sufficient to permit a reasonable jury to
find that Appellant committed intentional infliction of emotional
distress.  He relies upon the following
evidence to support his claim that Appellant engaged in a course of conduct
that was extreme and outrageous: 

(1)        Around July 1, Mr. Mendivil heard rumors
that he had been fired from other employees, some of whom reported hearing the
rumor from Mr. Richard Rosen;

 








(2)        On July 5, Mr. Rosen told the Alamogordo
store manager that Mr. Mendivil had been fired;

 

(3)        The company told Mr. Mendivil to travel
down to El Paso for a meeting without telling him what the meeting was about;

 

(4)        The company knew that Mr. Mendivil lived
in Santa Fe and knew that he would travel down to El Paso in the company van,
which they also knew was his only transportation, but never warned him that
they intended to take away the van and leave him stranded far from home;

 

(5)        When Mr. Mendivil arrived in El Paso,
Mr. Sales immediately demanded the company van, speaking loudly to him in
public and threatening to call the police;

 

(6)        After granting the one-hour delay which
Mr. Mendivil had to beg for, Mr. Sales refused to sign a return receipt,
yelled at Mr. Mendivil in front of passersby, threatened to call the police,
and made Mr. Mendivil=s
mother cry;

 

(7)        After July 5, Mr. Mendivil continued to
hear false statements that he had been fired for six to eight months from
prospective employers;

 

(8)        Even as late as February 1996, Richard
Rosen reported the false statement to a store manager;

 

(9)        Mr. Sales refused to give Mr.
Mendivil the recommendation he had promised;

 

(10)      The company failed to pay Mr. Mendivil his
vacation pay and the bonus he had earned; and 

 

(11)      When Mr. Mendivil attempted to
collect the money owed to him, Mr. Mark Rosen told him that the company
would defend their position >at
all cost,= accused
Mr. Mendivil of extortion and attempted blackmail, and threatened to have Mr.
Mendivil prosecuted for the >third
degree felony= of >unauthorized taking, copying, or
communication of the company=s
trade secrets.=

 








In considering the
legal sufficiency of Mr. Mendivil=s
emotional distress claim, we are mindful that the Texas Supreme Court was
recently reiterated that Aintentional
infliction of emotional distress is a >gap-filler= tort never intended to supplant or
duplicate existing statutory or common-law remedies.@  Creditwatch, Inc., 157 S.W.3d at 816; see
also Zeltwanger, 144 S.W.3d at 447. 
In his brief, Mr. Mendivil includes facts related to Appellant=s alleged defamatory conduct as
evidence to support his emotional distress, as we have noted above.  However, under the current law in Texas, Mr.
Mendivil cannot recover under this gap-filler tort where the same actions that
form the basis of his defamation claim are asserted to support his independent
tort claim for intentional infliction of emotional distress.  Since this issue was not raised below, it is
not properly before us.[4]








After reviewing
the evidence as a whole and in the light most favorable to the jury=s verdict, we find that Appellant=s conduct, whether excluding or
including the defamatory-related conduct, does not rise to the level of extreme
and outrageous conduct sufficient to meet the exacting requirements of an
intentional infliction of emotional distress claim.  See Creditwatch, Inc., 157 S.W.3d at
816.  Rude behavior does not equate to
outrageousness, and behavior is not outrageous simply because it is
tortious.  Natividad v. Alexsis, Inc.,
875 S.W.2d 695, 699 (Tex. 1994).  While
representatives of the company treated Appellant rudely, insensitively,
verbally threatened him, and, as alleged by Mr. Mendivil, defamed his
reputation, this conduct simply does not rise to the level of outrageousness
necessary to establish the tort.  See
GTE Southwest, Inc., 998 S.W.2d at 612 (A[M]ere
insults, indignities, threats, annoyances, petty oppressions, or other
trivialities do not rise to the level of extreme and outrageous conduct.@); see e.g., Tiller, 121 S.W.3d
at 714-15 (defendant=s
callous, insensitive, and rude behavior as well as his breach of contract in
the parties=
commercial dispute did not rise to the level of extreme and outrageous
conduct); Southwestern Bell Mobile Sys., Inc. v. Franco, 971 S.W.2d 52,
54 (Tex. 1998)(per curiam)(manner of termination was not extreme and outrageous
conduct where employer fired plaintiffs in the presence of coworkers, forced
them to collect and remove their belongings in front of others, and immediately
took steps to repossess car phones owned by the employer); Wornick Co. v.
Casas, 856 S.W.2d 732, 735 (Tex. 1993)(manner of termination was not
extreme and outrageous conduct where employee was suddenly fired, given no
explanations, was told to leave immediately, was escorted off the premises by a
security guard, and was never given a promised post-termination meeting); Diamond
Shamrock Ref. & Mktg. Co. v. Mendez, 844 S.W.2d 198, 202 (Tex.
1992)(falsely depicting in the community that an employee is a thief is not
sufficiently outrageous conduct to support a claim).  Appellant=s
conduct simply was not so extreme as to bring Appellant=s
conduct outside the scope of an ordinary employment dispute nor did it Ago beyond all possible bounds of
decency@ as to be
Aatrocious, and utterly intolerable in a
civilized community.@  See Zeltwanger, 144 S.W.3d at 445; GTE
Southwest, Inc., 998 S.W.2d at 613. 
We conclude there is no evidence to support this essential element of
Mr. Mendivil=s claim
for intentional infliction of emotional distress.  Moreover, the record conclusively establishes
that Appellant=s conduct
was not extreme and outrageous.  Because
the evidence is legally insufficient to support the emotional distress claim,
we sustain Issue One.

Defamation








In Issue Two,
Appellant contends that Mr. Mendivil cannot establish that it defamed him
because there was no evidence that Mr. Richard Rosen communicated the false
statement that Mr. Mendivil had been fired to anyone outside the company or
that this false statement was not received by a corporate employee in the
course and scope of their duties for the company.  In effect, Appellant is contending that the
defamatory statements were subject to its affirmative defense of qualified
privilege.

Slander is a defamatory
statement that is orally communicated or published to a third person without
legal excuse.  Randall=s Food Markets v. Johnson, Inc.,
891 S.W.2d 640, 646 (Tex. 1995).  A
statement is defamatory if the words tend to injure a person=s reputation, exposing the person to
public hatred, contempt, ridicule, or financial injury.  Tex.Civ.Prac.&Rem.Code
Ann. ' 73.001
(Vernon 2005); Austin v. Inet Technologies, Inc., 118 S.W.3d 491, 496
(Tex.App.--Dallas 2003, no pet.).

A corporation may
be held liable for defamation by its agent if such defamation is referable to
the duty owing by the agent to the corporation and was made in the discharge of
that duty.  Texam Oil Corp. v. Poynor,
436 S.W.2d 129, 130 (Tex. 1968); Wal-Mart Stores, Inc. v. Lane, 31
S.W.3d 282, 288 (Tex.App.--Corpus Christi 2000, pet. denied).  A corporation may also be held liable for
tortious acts of a vice-principal of the corporation.  Lane, 31 S.W.3d at 288.  A vice-principal is a corporate officer, a
person with authority to employ, direct, and discharge servants of the master,
or a person with whom the master has confided the management of the whole or
part of a department or division of the business.  Id.








Legal excuse for
defamation includes the defense of qualified privilege.  Hanssen v. Our Redeemer Lutheran Church,
938 S.W.2d 85, 92 (Tex.App.‑-Dallas 1996, writ denied).  A qualified privilege attaches to bona fide
communications, on a subject in which the speaker has an interest or duty to
another person having a corresponding interest or duty.  See TRT Dev. Co.‑KC v. Meyers,
15 S.W.3d 281, 286 (Tex.App.--Corpus Christi 2000, no pet.); Hanssen,
938 S.W.2d at 92, citing Dixon v. Southwestern Bell Tel. Co., 607
S.W.2d 240, 242 (Tex. 1980); Martin v. Southwestern Elec. Power Co., 860
S.W.2d 197, 199 (Tex.App.--Texarkana 1993, writ denied).  This privilege is termed conditional or
qualified because a person availing himself of it must use it in a lawful
manner and for a lawful purpose.  Hanssen,
938 S.W.2d at 92.  Similarly, a
conditional or qualified privilege attaches to employer communications made in
the course of an investigation following a report of employee wrongdoing.  Randall=s
Food Markets, 891 S.W.2d at 646.  The
privilege remains intact as long as communications pass only to persons having
an interest or duty in the matter to which the communications relate.  Id. 
Proof that a statement was motivated by actual malice existing at the
time of publication defeats the privilege. 
Id.  When the facts are
undisputed and the language used in the publication is not ambiguous, the
question of privilege is ordinarily a question of law.  See TRT Dev. Co.‑KC, 15 S.W.3d
at 286; Dixon, 607 S.W.2d at 241.








Appellant contends
that it established its qualified privilege defense because there was no direct
evidence that company employees communicated the false statement to anyone
outside the company, rather Mr. Richard Rosen communicated the false statement
solely to his employees.  In so arguing,
Appellant relies on Mars, Inc. v. Gonzalez, 71 S.W.3d 434, 437
(Tex.App.--Waco 2002, pet. denied), which Appellant argues establishes a Atest@
for holding a corporate entity guilty of libel for its agents acts.  In Mars, Inc., an employee sued his
employer for libel based on mass distribution of allegedly defamatory
statements through the employer=s
e-mail system.  Mars, Inc., 71
S.W.2d at 436.  Under the jury charge
given in that case, the Mars, Inc. court stated that to hold Mars guilty
of libel, there must be evidence that: 
(1) an agent of Mars; (2) acting Aon
behalf of the corporation@
(in the course and scope of their duties for Mars); (3) communicated a false
statement; (4) to a person (a) other than a Mars employee or (b) to a Mars
employee whose course and scope of their duties for Mars did not require
receipt of the false communication; (5) and that communication proximately
caused; (6) damages to Gonzalez.  Mars,
Inc., 71 S.W.3d at 437.  On its face,
it appears that the test espoused in Mars, Inc. was limited to the
particular facts of that case and the Mars, Inc. court=s sufficiency review was based on the
particular charge given to the jury. 
Therefore, we find the Mars, Inc. test instructive, but not
dispositive in our review of Appellant=s
asserted qualified privilege defense.








Appellant concedes
that Mr. Rosen, as owner of Richard Rosen, Inc., was an agent of the
corporation.  Appellant also concedes
that Mr. Rosen=s
statements to store managers Mr. Garcia and Mr. Hinijosa that Mr. Mendivil had
been fired were false.  Instead,
Appellant argues that these false statements were not made to anyone outside
the company, but rather were made only to employees who were required to
receive the false communication in the course and scope of their duties for the
company.  Specifically, Appellant argues
that Mr. Garcia and Mr. Hinijosa worked closely with Mr. Mendivil in managing
the stores, delivery of goods, and remodeling, therefore these employees were
within the circle of company employees whose course and scope of duties
required receipt of the communication from Mr. Rosen.  According to Mr. Mendivil, by July 1, he had
begun to hear rumors that he had been fired and several store employees told
him that they received the news from Mr. Rosen himself.  Mr. Garcia testified that Mr. Rosen called
him on July 5 and told him that Mr. Mendivil had been fired.  Even assuming that Mr. Rosen made this
communication out of an interest and duty to report Mr. Mendivil=s alleged termination to a fellow
coworker who held a corresponding interest in the information for purposes of
managing the store, there was some evidence that Mr. Rosen made the false
statement to Mr. Hinijosa several months after Mr. Mendivil=s employment had ended.  Due to a prior dispute between Mr. Hinijosa
and Mr. Mendivil in May 1995, Mr. Mendivil was no longer Mr. Hinijosa=s immediate supervisor.  Thus, there was no business reason for Mr.
Rosen to communicate the false statement to Mr. Hinijosa under Appellant=s defense theory.  Because there is some evidence that Mr. Rosen
communicated the defamatory statement to a company employee who did not have an
interest or duty with regard to the information, Appellant cannot conclusively
establish its qualified privilege defense as a matter of law.

In addition to the
evidence discussed above, Mr. Mendivil testified that in late July, he heard
that he had been fired from sales representatives who did business with
Appellant.  During the same period, Mr.
Martinez, a Santa Fe restaurant owner, heard that Mr. Mendivil had been fired
from Delia Sandoval, a commercials sales representative for a Spanish language
television station.  Mr. Mendivil
testified that another local restaurant owner also told him that she had heard
he was fired by Appellant.  According to
Mr. Mendivil, Santa Fe is a small community and everyone soon knew the rumors.








Viewing the
evidence in the light most favorable to the verdict, we find that the jury
could have reasonably inferred that Appellant was the source of the false
statements about Mr. Mendivil. 
Although Mr. Sales attempted to dispel rumors that Mr. Mendivil had been
fired by issuing a formal statement notifying all store managers that Mr.
Mendivil had resigned, Mr. Rosen continued to tell company employees Mr.
Mendivil had been fired.  A sales
representative from a distributor who did business with Appellant also heard the
same false statement.  Because there is more
than a scintilla of evidence to support the jury=s
finding that Appellant published defamatory statements about Mr. Mendivil, we
conclude there was legally sufficient evidence to support the defamation
claim.  Issue Two is overruled.

Exemplary
Damages

In its third
issue, Appellant contends the trial court erred in denying its amended JNOV on
the award of exemplary damages. 
Appellant asserts that exemplary damages award must be reversed because
it was predicated on the award of actual damages for the intentional infliction
of emotional distress claim.








As we concluded in
our disposition of Issue One, there was legally insufficient evidence to
support the jury=s finding
on Mr. Mendivil=s
emotional distress claim.  An award of
actual damages is necessary to support an award of punitive damages.  Juliette Fowler Homes, Inc. v. Welch
Assoc., Inc., 793 S.W.2d 660, 667 (Tex. 1990).  However, in this case, the charge given to
the jury instructed it to measure exemplary damages based on the conduct found
in response to an affirmative finding of liability under Question 2 (an
affirmative malice finding predicated on an affirmative finding on the
emotional distress claim) or Question 4 (an affirmative finding on the
defamation claim).  There is nothing in
the jury charge that limits the exemplary damages question to only the
emotional distress claim.[5]  Because Mr. Mendivil is entitled to recover
actual damages on the defamation claim, the award of punitive damages is
adequately supported.  Issue Three is
overruled.

Because Mr.
Mendivil=s claim
for defamation was supported by legally sufficient evidence, we affirm the
portion of the trial court=s
judgment awarding Mr. Mendivil $100,000 for his defamation claim and $25,000 in
exemplary damages.  However, because the
evidence was legally insufficient to support the jury=s
finding that Appellant intentionally inflicted emotional distress upon Mr.
Mendivil, we reverse that portion of the trial court=s
judgment on the emotional distress claim, and render judgment that Mr. Mendivil
take nothing on that damage claim only.

 

 

November
23, 2005

DAVID WELLINGTON
CHEW, Justice

 

Before Barajas, C.J., McClure, and Chew, JJ.











[1]
Kirk Sales is not a party to this appeal. 





[2]
Richard Rosen passed away during the pendency of the litigation.





[3]
The February 20 letter stated that Mr. Mendivil had been pre-paid his 1995
bonus in the amount of $12,700, however, Mr. Sales later testified that the
company=s
controller had inadvertently overpaid the 1994 bonus to Mr. Mendivil from
November to April 1995 in the amount of $18,500, which was to be applied
against the 1995 bonus.  Mr. Sales
testified that he informed Mr. Mendivil of the bonus situation by letter dated
April 27, 1995.





[4]
In post-submission letter briefs filed after oral argument, both parties agree
that a Agap
filler@ tort
issue was not raised at trial and was not briefed on appeal.  See Zeltwanger, 144 S.W.3d at 450
(finding Agap-filler@ argument not waived where raised in
defendant=s motion
for judgment non obstante veredicto).





[5]
Although the issue is not raised by either party directly, we observe that the
jury charge in this case was defective in that the exemplary damages question
as to the defamation claim was not correctly conditioned on an affirmative
finding of malice.  While Mr. Mendivil
may have intended that Question 2, the malice question, be applied to both
liability claims, a literal reading of the jury charge indicates that Question
2 was solely predicated on an affirmative finding to Question 1, the
intentional infliction of emotional distress claim.  Appellant raised no objection to the jury
charge at the formal charge conference. 
Since Appellant failed to preserve the issue of the omitted predicate
malice finding for the punitive damages award on the defamation claim, it
cannot complain of the error on appeal.  See
Tex.R.Civ.P. 278 (an objection
suffices to preserve error concerning trial court=s
failure to submit a jury question upon which the opposing party relies).