**MARS, INCORPORATED, Appellant,**

v.

**Lino GONZALEZ, Appellee.**

**No. 10–99–166–CV.**

Court of Appeals of Texas,
Waco.

Jan. 30, 2002.

Rehearing Overruled April 17, 2002.

the transportation code in 1995.

Frederick deB. Bostwick, III, Keith C. Cameron, Naman, Howell, Smith & Lee, P.C., Waco, Harry Harmon, David A. Flores, Harmon & Davies, P.C., Lancaster, PA, for appellant.

Minor L. Helm, Jr., Michael G. Cosby, Pakis, Giotes, Beard & Page, P.C., Waco, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

TOM GRAY, Justice.

Lino Gonzalez sued Mars, Incorporated and two independent contractors for libel. He won a 2 million dollar verdict against Mars. Mars appeals. We reverse and render.

### BACKGROUND

Gonzalez supervised two design contractors, Steve Morton and Jesse Tollison, at the Mars plant in Waco, Texas. The contractors claimed Gonzalez verbally abused them. Tollison claimed Gonzalez also physically assaulted him. The day Morton resigned his job, he composed a lengthy e-mail (the Morton e-mail) discussing his displeasure with Gonzalez and discussing Gonzalez's alleged unfavorable attributes. He distributed this e-mail through the Mars system to approximately 150 Mars mailboxes. Once officials at Mars discovered the e-mail, they met and devised a plan to remove it.

At the time of the Morton e-mail, Mars had already begun an investigation of Gonzalez. It was also discovered that Tollison was working on his own letter. Tollison also discussed Gonzalez's alleged unfavorable attributes in his letter. Management requested Tollison to finish writing the letter concerning his treatment by Gonzalez. Mars instructed Tollison to provide only Mars management with a copy of the completed letter. Contrary to Mars's instructions, Tollison distributed the letter to people other than Mars management.

### THE TRIAL

The jury was asked:

Did Mars libel Lino Gonzalez?

*Libel* is a false communication to a third party in written or other graphic form which tends to injure a person's reputation and thereby exposes the person to public hatred, contempt or ridicule. . . .

Under the general instructions, the jury was given the following instruction:

You are instructed that corporations such as Defendant Mars, by its very nature, cannot function without human agents and therefore, as a general rule, the actions of its corporate agents on behalf of the corporation are deemed the corporation's acts.

Under this charge, which we do not endorse, Gonzalez was required to establish a libel by proving a false communication by Mars to a "third party," i.e., someone other than Mars and Gonzalez. The only communications at issue in the trial of this case were the Morton e-mail and the Tollison letter.

The charge included an instruction about qualified privilege. The instruction is as follows:

You are instructed that a qualified privilege protects Mars from intracompany communications involving reasons for an employee's alleged misconduct, but only so long as Mars does not abuse the privilege. To defeat the qualified privilege, Gonzales [sic] must prove with clear and convincing evidence that Mars acted with malice. "Malice" means to make a statement knowing that it is not true, or to act with reckless disregard for the statement's truth.

Based on the record and briefs, we do not believe this instruction will impact our analysis. Gonzalez has not identified any "intracompany communication" he believes is a libel "involving reasons for an employee's (Gonzalez's) alleged misconduct" as required to satisfy the instruction on qualified privilege as given in the charge.

### PUBLICATION

■ The publication of an allegedly libelous letter requires a showing that the

letter was received, read, and understood by a third person. *Simmons v. Ware*, 920 S.W.2d 438, 444 (Tex.App.—Amarillo 1996, no pet.); *Putter v. Anderson*, 601 S.W.2d 73, 78 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). A corporation may be held liable for defamation by its agent if such defamation is referable to the duty owing by the agent to the corporation and was made in the discharge of that duty. *Cotton Belt R.R. v. Hendricks*, 768 S.W.2d 865, 870 (Tex.App.—Texarkana 1989, no writ) (citing *Texam Oil Corp. v. Poynor*, 436 S.W.2d 129 (Tex.1968)). The actions of an agent are not presumed to be within the scope of his authority. *Id.* (citing *In re Westec Corp.*, 434 F.2d 195 (5th Cir.1970)). In this case the jury was instructed, "as a general rule, the actions of its corporate agents *on behalf of* the corporation are deemed the corporation's acts." (emphasis added). An agent who steps outside the boundaries of his authority acts independently and not on behalf of the corporation. *See Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 647 (Tex.1995); *Cotton Belt R.R.*, 768 S.W.2d at 871.

■ An employer has a conditional or qualified privilege that attaches to communications made in the course of an investigation following a report of employee wrongdoing. *Randall's*, 891 S.W.2d at 646. The privilege remains intact as long as communications pass only to persons having an interest or duty in the matter to which the communications relate. *Id.*

### SUFFICIENCY OF THE EVIDENCE

■ In its first and fourth issues, Mars contends there is no evidence that it published the Morton e-mail or Tollison letter to a third party. In reviewing legal insufficiency points, we consider only the evidence and inferences that, when viewed in their most favorable light, tend to support the finding, and disregard all evidence

and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 396 (Tex.App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988); *Marshall Field*, 859 S.W.2d at 396. We are required to review the sufficiency of the evidence based upon the charge submitted, even if erroneous. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568–569 (Tex.1985); *Allen v. American Natural Ins. Co.*, 380 S.W.2d 604, 609 (Tex.1964); *see also Wal-Mart v. Sturges*, 52 S.W.3d 711, 729–730 (Tex.2001) (Justice O'Neil concurring).

■ Thus, to hold a corporate entity like Mars guilty of libel under this charge, there must be evidence that: 1) an agent of Mars; 2) acting "on behalf of the corporation" (in the course and scope of their duties for Mars); 3) communicated a false statement; 4) to a person a) other than a Mars employee or b) to a Mars employee whose course and scope of their duties for Mars did not require receipt of the false communication; 5) and that communication proximately caused; 6) damages to Gonzalez. Satisfaction of all the elements must be proven to be connected to the same communication of the same false statement. For example, if the communication of the same false statement was by someone other than an employee of Mars or by an employee of Mars acting outside the scope of their duties for Mars, Gonzalez has failed to establish that Mars committed a libel of Gonzalez.

■ We examined the record for every publication which Gonzalez contends was libelous. We found none made by Mars.

PUBLICATION WITHIN MARS

Gonzalez states in his brief,

While it is not clear how many people reviewed the E-mail directly, there was testimony that it was received and reviewed by at least Rusty Hangsen [sic] (Senior Engineer), Kenneth Hampton (P & O Manager and acting Plant Manager for the day), Bill Sharp, Mary Lou Carter, Darlene Beshear, Hattie Black, Dick Brucker, Don Jergensen [sic], Ed Lewis, Scott Smith and [sic] well as numerous Mars' associates and upper management in Waco, Cleveland, Tennessee, McLean, Virginia and Hacketstown, New Jersey.

Each person mentioned by Gonzalez in this paragraph of his brief is a Mars employee. Gonzalez's brief infers that each of these individuals received the e-mail directly from Morton. If the e-mail was received directly from Morton, Mars is not guilty of libel because Morton was not an agent of Mars. We will give Gonzalez the benefit of a broader reading of his brief to include the receipt of the e-mail from any source supported by the record. We review the testimony of these individuals in the order Gonzalez presented them.

**Rusty Hansgen**

Hansgen did not testify at trial. His review of the e-mail is referenced in the summary of John Sager's testimony.

**Kenneth Hampton**

Hampton was the personnel and organizations manager at the Mars/Waco plant at the time the e-mail was sent. He was authorized to investigate allegations of employee misconduct. When he came to work, he recalled someone telling him about the e-mail. After that, he reviewed the e-mail and determined it contained "disturbing" and "serious" allegations. He also determined the e-mail system, which was to be used for business purposes only, was used inappropriately to distribute the e-mail. Hampton wanted to stop the e-mail before anyone else saw it. He told John Sager to try to delete and stop the e-mail. Hampton called a managers' meeting, as he was authorized to do, where he told all the managers about the inappropriate e-mail. They were told to disregard, delete, not read, and not forward the e-mail. He also talked with both Morton and Gonzalez about the allegations.

**Bill Sharp**

Sharp did not testify at trial. His contact with the e-mail is referenced in the summary of John Sager's testimony.

**Mary Lou Carter**

Carter did not testify at trial. Gonzalez provided the only testimony regarding Carter. She was an associate whose desk was in the same area as those who first discovered the e-mail. Gonzalez presented no evidence that Carter ever received the e-mail or passed it on to others.

**Darlene Beshear**

Beshear was an accounting technician and engineering employee at the Mars/Waco plant. She was not at work the day the e-mail was sent. However, sometime after she returned to work, she remembered being given a "hard copy" of the e-mail by an employee at Mars. There is no evidence regarding the name of the employee who gave her the copy. She remembered the e-mail being discussed at work and thought everyone was probably talking about it.

**Hattie Black**

Black was an administrative technician at the Mars/Waco plant. She worked for the Plant Manager, Ed Lewis. She saw the e-mail the morning it was sent. She recognized that it was a problem. Black printed it out and called it to the attention of the person in charge since Lewis was not in the office that day.

### Dick Brucker

Brucker did not testify at trial. His role in relaying the e-mail to others is referenced in the summary of Scott Smith's testimony.

### Don Jurgensen

Jurgensen was the technical director for the Mars/Waco plant. He was also Gonzalez's direct supervisor. He was contacted while on vacation in Florida by Hampton. Hampton read the e-mail over the phone to Jurgensen. He was also informed that Gonzalez would be suspended during the investigation of the allegations contained in the e-mail.

### Ed Lewis

Lewis was the plant manager of the Mars/Waco plant. He was not in the plant on the day the e-mail was sent. Hampton called and told him about the e-mail. He was also part of the team that decided to terminate Gonzalez.

### Scott Smith

Smith worked for the Mars/Waco plant as a technical drafter and designer. He had been on vacation when the e-mail was sent. When he stopped in to pick up his paycheck, Dick Brucker, a maintenance technician, told him about the e-mail. Smith then met with Hampton and Hansgen. Smith was told at this meeting to delete the e-mail. He printed the e-mail before deleting it. Smith then showed the e-mail to his wife. Later, Tollison showed him a copy of the Tollison letter.

In a supplemental brief, Gonzalez added three more people to the list of Mars employees who reviewed the e-mail.

### Linda Jander

Jander did not testify at trial. Gonzalez provided the only testimony regarding Jander. She was an associate whose desk was in the same area as those who first discovered the e-mail. Gonzalez presented no evidence that Jander ever received the e-mail or passed it on to others.

### Ira Greene

Greene was the technical director for the Mars corporation. He never saw the e-mail, but he learned of Gonzalez's termination from Fred Hayes, the plant manager of Mars/Cleveland. Hayes told Greene of the e-mail "incident" and of his steps taken to delete and collect all copies of the e-mail.

### John Sager

Sager was the senior engineer for systems operation and had the responsibility for the e-mail system at the Mars/Waco plant. Rusty Hansgen, also a senior engineer, talked to Sager the morning the e-mail was sent. Hansgen had already read the e-mail and wanted to know if anything could be done to stop it. Sager then read the e-mail. Both contacted Sager's supervisor, Bill Sharp. The three discussed their options: (1) do nothing; (2) shut down the server; or (3) enter all accounts, change the passwords and delete the message. They chose the third option. Sharp arranged for a manager's meeting to tell them about the e-mail and to delete it. Sager put two staff members to work on deleting the e-mail.

PERSONS OUTSIDE MARS

Next, Gonzalez states in his brief:

In addition, the Morton E-mail was published to numerous people outside of the Mars' organization including Mike Wilson, Charles Cronin, Jr., Charles Cronin, Sr., George Thomas, Noe Gaeton (with Allied Signal), Carlton Deal (president of the Union at Allied Signal in Cleveland, Tennessee), Robert Bush (Jackson, Tennessee), Mike Leisure (Murphysboro, Tennessee, a former sheet metal contractor), Scott's [sic] Smith's wife and other contractors, vendors and prospective employers.

We will also review the testimony of these individuals in the order Gonzalez presented them in his brief.

### Mike Wilson

Wilson had worked for a company that supplied products for the Mars/Cleveland plant. He saw a copy of the Morton e-mail. Leonard Hilton, another contractor, provided Wilson with the copy. Wilson, in turn, gave a copy to his mother-in-law, the owner of the company for which Wilson worked.

### Charles Cronin, Jr.

Charles, Jr. is the vice-president of Chattanooga Sheet Metal. Tollison asked Charles about the Morton e-mail. Charles had not heard anything about it, so he contacted his father, Charles Cronin, Sr. Charles, Sr. had heard about the e-mail. Tollison then brought Charles, Jr. a copy of the e-mail and said he was writing up his own version. Tollison brought his letter to Charles, Jr. about a week later. Charles, Jr. faxed the e-mail and the letter to his father. He did not give either to anyone else.

### Charles Cronin, Sr.

Charles, Sr. did not testify at trial. His review of the e-mail is referenced in the summary of his son's testimony above.

### George Thomas

Thomas had been a contractor for Mars until 1995. He received the e-mail by fax "from somebody at Mars," but could not remember from whom. He narrowed the list to three names, but testified that all three were contractors, not Mars employees. Thomas eventually misplaced his copy of the e-mail. He requested another copy from another contractor.

### Noe Gaytan

Gaytan worked for Allied Signal and had worked there since 1966. He saw a copy of a "document." Carlton Deal, the president of the union, gave him a copy. Deal told him a copy had been left in his office. Gaytan then gave the document to De-Wayne Holly, the maintenance manager, to read and put away without circulating it. Gaytan assumed that Holly showed the document to his boss also.

### Carlton Deal

Deal did not testify. His contact with the e-mail is referenced in the summary of Noe Gaytan's testimony above.

### Robert Bush

Bush received a copy of the e-mail while he worked at Proctor & Gamble. Someone at the Cleveland plant sent it to him. He did not remember who sent it. Bush thought the e-mail was "trash" and shredded it.

### Mike Leisure

At the time the e-mail was sent, Leisure worked for Pillsbury. A former contractor for Mars gave him a copy of the e-mail. Leisure read the e-mail and eventually threw it away. He did not know anything about the Tollison letter.

### Scott Smith's Wife

Smith's wife did not testify. Her receipt of the e-mail is referenced in the summary of Scott Smith's testimony.

In a supplemental brief, Gonzalez added one person to the list of people to whom the e-mail was "published" outside of Mars.

### Vic Turner

Turner was the plant manager for Duracell. He denied ever seeing the e-mail or Tollison's letter. He thought Leonard Hilton raised a question with him about whether Gonzalez was affiliated with Chattanooga Sheet Metal. Turner denied that this question or the e-mail had anything to do with Gonzalez's discharge from Duracell.

## APPLICATION—TOLLISON'S LETTER

The only persons listed by Gonzalez who saw Tollison's letter were Scott Smith and Charles Cronin, Jr.[1] Tollison, himself, gave these two individuals the letter. Tollison was not a Mars employee. Thus, there is no evidence that Mars published the Tollison letter.

## APPLICATION—MORTON'S E-MAIL

Of the Mars employees who read the Morton e-mail,[2] only Darlene Beshear and Dick Brucker were not involved in either the investigation of Gonzalez, including the allegations in the e-mail, or the investigation and efforts to stop distribution of the e-mail. Beshear could not recall who gave her a copy of the e-mail. There is no evidence that the person who gave her a copy of the e-mail was doing so *on behalf* of Mars. There was no evidence presented as to how Brucker knew of the e-mail.

Hattie Black read the e-mail distributed to her by Morton and, sensing it was a problem, forwarded it to the person in charge of the plant that day.

The others identified by Gonzalez were part of the investigation of alleged wrongdoing by Gonzalez or were part of the team organized to deal with the unauthorized use of the e-mail system. Thus, it was received by them within the course and scope of their duties for Mars.

Morton was an independent contractor. Other than Mars employees, discussed above, and Smith's wife, every person who saw the Morton e-mail either received it from another contractor or could not remember who sent it to them. The only person Gonzalez listed other than Mars employees and contractors who received the e-mail from a Mars employee was Scott Smith's wife. Smith gave a copy of the e-mail to his wife. He had been told to delete it. Smith acted independently, not *on behalf of* Mars, when he distributed the e-mail to his wife. Thus, there is no evidence that Mars published the e-mail to Smith's wife.

Based on the charge as submitted to the jury, we find no evidence to support the jury's verdict that Mars libeled Gonzalez. Issues one and four are sustained. Because of our disposition of these issues, we need not reach the remaining issues.

## CONCLUSION

Mars argued there was no evidence of publication in a motion for judgment notwithstanding the verdict. The trial court denied the motion. Having found no evidence of publication by Mars to a third party, Mars is entitled to rendition of judgment in its favor. We reverse the judgment and render judgment that Lino Gonzalez take nothing.

BILL VANCE, Justice, dissenting.

The majority deals with Gonzalez' theory of "publication" by ignoring it. In his reply brief, Gonzalez asserts that Section 577 of the Second Restatement of Torts applies to the issue. RESTATEMENT (SECOND) OF TORTS § 577 (1977). His theory is: the jury found that Mars acted "intentionally and unreasonably" (words of the Restatement) when it chose to change the passwords and delete the message from individual workstations rather than shutting down the email server.[1]

---

1. Arguably Charles, Sr. saw the Tollison letter because Charles, Jr. faxed it to him. However, Charles, Sr. did not testify, and it is unknown whether Charles, Sr. ever received the fax.

2. Ira Greene never saw the e-mail.

1. The majority acknowledges that Mars had three options: "(1) do nothing; (2) shut down the server; or (3) enter all accounts, change the passwords and delete the message."

Section 577 recognizes liability for continued publication due to a failure to remove defamatory matter one knows to be exhibited on chattels (which would include a computer system) under his control. *Id.* § 577(2). One in that position is required to "exercise reasonable care to abate the defamation, and he need not take steps that are unreasonable if the burden of the measures outweighs the harm to the plaintiff." *Id.* § 577 cmt. p. Gonzalez produced evidence of the choices available to Mars through the testimony of John Sager, a senior engineer for Mars. Sager, the person responsible for "all the network and the systems servers at our site," testified that the email came to his attention early in the day, when he was told about it and asked if anything could be done to stop it. He said he outlined the three options and that he, Rusty Hansgen, and Bill Sharp made the decision to "take the last option." He said it took two people all day, eight hours, to accomplish the task. Although he maintained that he had been told by a consultant two days before trial that shutting down the server would result in a longer delay, he acknowledged that at his earlier deposition he had also said shutting down the server was a viable option. He said they chose option three because "it was a major disruption to our business to shut down the server," which would result in a lack of email at the Mars plant until the server was running again.[2] This testimony is some evidence from which the jury could find that Mars should have chosen the second option and stopped the offending email from spreading further.

Nothing in the charge required that the jury not consider this theory. It asked: "Did Mars libel Lino Gonzalez?" The charge is broad-form. TEX.R. CIV. P. 277.

It encompasses any viable theory of libel supported by the evidence. *See Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 663–64 (Tex.1999) ("Indeed, submission of a single question relating to multiple theories may be necessary to avoid the risk that the jury will become confused and answer questions inconsistently."); *but see Crown Life Insurance Company v. Casteel,* 22 S.W.3d 378 (Tex.2000) (when a trial court submits a single broad-form liability question incorporating multiple theories of liability, some of which were defective, the error is harmful and a new trial is required).

At least one "third person" received the email because Mars did not shut down the server. The majority acknowledges that Scott Smith was on vacation when the email arrived. When he returned, he was told to delete the email.[3] However, he printed it before he deleted it, then showed it to his wife, who was not a Mars employee. Evidence of that one "publication" after Mars elected not to shut down the email server defeats Mars' no-evidence issue.

I would reject Mars' no-evidence contention about publication. Because the majority decides otherwise, I dissent.

---

**2.** Shutting down the email server would not affect other parts of the computer network.

**3.** Why he would have to delete it if Mars had already changed his password and deleted it is not explained.