RICHARD ROSEN, INC., Appellant,

v.

Fernando MENDIVIL, Jr., Appellee.

No. 08–04–00077–CV.

Court of Appeals of Texas,
El Paso.

Nov. 23, 2005.

Rehearing Overruled Dec. 21, 2005.

Cori A. Harbour, The Harbour Law Firm, El Paso, for Appellant.

John P. Mobbs, El Paso, for Appellee.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

Appellee Fernando Mendivil sued his former employer, Richard Rosen, Inc., and its vice-president Kirk Sales for intentional infliction of emotional distress and defamation based on their conduct leading to and after the end of Mr. Mendivil's employment with the company.[1] The jury found in favor of Mr. Mendivil on both causes of action. The defendants filed a motion for judgment notwithstanding the verdict ("JNOV") and after a hearing, the trial court took the motion under advisement. The trial court granted the JNOV with respect to the punitive damages award as to Mr. Sales. The trial court then rendered judgment on the verdict and awarded Mr. Mendivil $290,120 in actual dam-

1. Kirk Sales is not a party to this appeal.

ages and $25,000 in exemplary damages, plus costs and interest. In three issues, Appellant Richard Rosen, Inc. contends the trial court erred in denying its amended motion for JNOV because there was no evidence to support Mr. Mendivil's causes of action or the award of exemplary damages. We affirm the trial court's judgment in part and reverse and render in part.

From 1992 to 1995, Appellant operated numerous retail stores in Texas and New Mexico. In late August 1992, a former employer of Mr. Mendivil recommended him for a managerial position with Appellant. Mr. Mendivil had previously managed a clothing store in El Paso. Mr. Mendivil interviewed with the owner Richard Rosen,[2] Mark Rosen, and Kirk Sales and was subsequently hired.

In November 1992, Mr. Mendivil started employment with Appellant as a supervisor for the company's stores in New Mexico. Mr. Mendivil moved to Santa Fe, New Mexico for the job. He was to receive a salary, a ten percent bonus or commission based on the gross profits for each store he supervised, an apartment, and sometime in the future, a van. Mr. Mendivil reported to Kirk Sales, the vice president of the company. To start, Mr. Mendivil made some quick changes to the Santa Fe store and the holiday season went very well. He then took over supervision of the Las Vegas store and increased sales at that store after remodeling it. By 1994, Mr. Mendivil was supervising six stores in New Mexico. In March 1995, the company issued a memorandum formally announcing Mr. Mendivil's position as the immediate supervisor of the company's New Mexico operations. The memorandum praised Mr. Mendivil as having "a good track record" and for being a "hard worker."

Mr. Mendivil traveled between the New Mexico stores on a weekly basis, to delegate certain tasks and to see how each store was progressing. When he traveled between the stores, Mr. Mendivil would also transport special orders, and certain products to balance out inventory. Mr. Mendivil was required to attend weekly management meetings in El Paso. Six months after he started with the company, Mr. Sales and Mr. Rosen offered to buy Mr. Mendivil a car, but he suggested that they buy him a van so that he could move products between the stores as needed. The company purchased a 1994 Chevy Astro Van for Mr. Mendivil's use and it reimbursed his gas and maintenance costs.

After March 1995, Mr. Mendivil began having communication problems with Mr. Sales and Mr. Rosen following a disagreement about the sales strategy for the fabric department. In April, Mr. Mendivil began to have additional problems with Mr. Sales and Mr. Rosen because they wanted to cut back on mailing costs. In a letter to Mr. Mendivil, Mr. Rosen complained about the need to cut expenses and criticized Richard Garcia, the manager of the Alamogordo store. Mr. Mendivil received more letters similar to the April letter from Mr. Rosen. In addition, Mr. Rosen reversed changes that Mr. Mendivil had made in remodeling the stores. Mr. Mendivil decided to resign from the company because he felt he was not getting cooperation from Mr. Rosen and Mr. Sales. Prior to making his decision to resign, he had no indication that they had any intention to fire him.

Mr. Mendivil met with Mr. Sales on June 10, 1995 at the Santa Fe store. He told Mr. Sales that he planned to resign. Mr. Sales asked him why and Mr. Mendivil

2. Richard Rosen passed away during the pendency of the litigation.

explained to him he was not getting cooperation from Mr. Rosen, particularly with regard to the remodeling changes he had ordered. Mr. Sales as was his custom, reminded Mr. Mendivil about being the highest paid employee and having a van, as his company perk. Mr. Mendivil told him that up until then, he had done a very good job in the stores, had increased sales, and trained good managers, but felt it was better that he move on because he did not want it to become a bad situation between them. Mr. Mendivil said he would stay on to do the inventory and then settle up on his bonuses. Mr. Sales thanked Mr. Mendivil for wanting to stay on to do all the inventory, praised him for his work, and promised to give him a good recommendation. During their conversation, Mr. Mendivil mentioned the company van because they had bought the van for him after he "ran [his] truck into the ground." Mr. Sales told Mr. Mendivil that he would talk to Mr. Rosen and work out a deal. He and Mr. Sales agreed that the resignation would be effective August 1.

In his deal with Mr. Sales, Mr. Mendivil gave his notice of resignation, but wanted to settle up on the bonus, which was based on the inventory taken of all the stores. Mr. Sales told Mr. Mendivil that it would take until August 1 to tabulate the inventory, so the date of August 1 was chosen for purposes of settling up the bonus and also Mr. Mendivil would have time to finish remodeling the stores.

Mr. Mendivil and Mr. Sales telephoned Mr. Rosen and informed him that "Fernie just resigned." Mr. Sales gestured to Mr. Mendivil to leave so he could continue the conversation in private and Mr. Mendivil left the room to continue preparing the store for inventory that afternoon. According to Mr. Mendivil, no one ever told him that he was abusive, he never was told

he was a bully, and they never told him of any complaints against him.

On June 26, 1995, Mr. Mendivil had a conversation with Mr. Sales at the store in El Paso on the sales floor. Mr. Mendivil was there to pick up some merchandise to take back to Santa Fe on his return. Mr. Sales suggested that they move up the date that he was suppose to be leaving because it might be better for the company. Mr. Mendivil reminded him that they had made an agreement and told him that he had already set up his schedule based on that date and it would be an inconvenience. Mr. Sales said "[a]ll right" and "[w]e'll go discuss it with [Mr. Rosen]." Mr. Rosen, however, had already left that day. Mr. Mendivil tried to talk to Mr. Rosen on June 27, but Mr. Rosen had gone out to his ranch.

On June 28, Mr. Mendivil spoke with Mr. Rosen. By that time all the physical inventories of the New Mexico stores were complete. Mr. Mendivil went to Mr. Rosen's office and told him that Mr. Sales had mentioned to him the other day that he was thinking about changing his leaving date. Mr. Mendivil reminded Mr. Rosen that they had agreed upon the August 1 leaving date. He also told him that it was only fair that Mr. Rosen honor the agreed upon date since he had not left them hanging with inventories and so forth. Mr. Rosen agreed and then questioned him about why he was leaving. Mr. Rosen tried to talk Mr. Mendivil out of leaving, told him that he would call him, and said "I think we can fix all of this."

Two days later, Mr. Mendivil wrote a letter to Mr. Rosen. In the letter, Mr. Mendivil stated the following in part:

As you are well aware, I gave notice to resign as supervisor of your stores, on Sat. June 10th. I explained to you that my reason was that I felt I was being forced to resign by you, because of lack

of your support from you as owner of this company. I felt it impossible to do my job properly as I have been, without this support which you had shown me in the previous years. In addition, the constant references by Kirk Sales made toward paying me the highest salary in the company and paying for my apartment and that [the] company bought me a van. This plication [sic] that I wasn't worth these expenses and constant harassment about this, was to much to be dealing with. I believe the van was to haul merchandise from store to store, or do I get to keep it?

My resignation was accepted by Mr. Kirk Sales. After discussion, we both agreed my last day of employment would be 8/1/95. I offered to stay and complete the year end inventories and releave [sic] Robert Garcia during his vacation. In addition it would give Kirk enough time to finish the year end finacial [sic] statements. Kirk thanked me and accepted this very fair notice. He said he was very appreciative of my effort to make a smooth transition.

On Monday, 6/26/95, Kirk and I again discussed my departure. He stated that you all had discussed my leaving and felt it best I leave at once. I stated that I had made up my schedule and plans to leave on 8/1/95, as previously agreed. I told him it was not very fair to displace me in this manner, since he had accepted the time table we discussed on Sat. June 10th; when I first gave him my resignation. I tryed [sic] to finish our discussion, but he was too busy on the phone with Phil. He suggested I talk to you, but you had left the building. I again tryed [sic] to talk to you on Tues. 6/27/95, but he told me you were at 'the ranch.' When you and I finally were able to talk on Wed. 6/28/95, I was able to explain why I felt you were forcing me to resign, but you had to leave be-fore we discussed my departure date etc. You asked for my home phone number and said you would call, but never did.

At this writing, I am not sure what you actually want me to do!

Mr. Mendivil also requested that they meet to discuss how he should account for his time through August 1 as well as severance-related matters. Mr. Mendivil received no response to the June 30 letter.

On about July 1, Mr. Mendivil began to hear rumors from other employees of the company that he had been fired. He told them that he had resigned and that they had misunderstood the news of his resignation. Mr. Mendivil decided to fax a letter to all store managers as well as to Mr. Rosen. The July 1 letter stated in part:

There have been incorrect rumors spread, that I have been fired by Mr. Richard Rosen. Employees at several stores have stated that they recieved [sic] a call from Mr. Rosen himself. This incorrect and damaging and vicious rumors are very damaging to my character. I would like to correct this by making you aware of the truth! I resigned on 6/10/95. I gave notice to Mr. Kirk Sales that my last day would be 8/1/95, and he agreed and accepted this date. If there is any change to this date, it will be at the request of Mr. Rosen, and new arrangements will be made. I will honor my word to stay till 8/1/95 and will make myself to you, available.

No one in the company contacted Mr. Mendivil about the July 1 letter.

Right before the July 4 weekend, Mr. Mendivil received a message from the Santa Fe store manager that he was wanted in El Paso on Monday. Mr. Mendivil packed up a few items of clothing and picked up

some merchandise to deliver to the Alamogordo store on his way to El Paso. When Mr. Mendivil arrived at the store in Alamogordo, the store manager, Richard Garcia, asked him what he was doing there and told him Mr. Rosen said he had been fired. Mr. Mendivil was shocked by Mr. Garcia's statement and could not believe what he was hearing.

According to Mr. Garcia, Mr. Rosen called him that day and told him that Mr. Mendivil was no longer with the company and had been fired. Mr. Garcia was shocked by the news and, at first, thought less of Mr. Mendivil because "when someone gets fired there's probably a reason for it." Mr. Garcia recalled that Mr. Mendivil wondered aloud how Mr. Garcia could know about this before he did. They unloaded the van and Mr. Mendivil continued on his way to El Paso.

When Mr. Mendivil arrived in El Paso, Mr. Sales told him that they had decided it was better for the company for him to leave immediately. Mr. Sales demanded the keys to the van, which caught Mr. Mendivil off-guard. Mr. Mendivil reminded him that they had agreed he would stay on until the inventories were tabulated and that he was leaving August 1. Mr. Mendivil stated that he fulfilled his part of the agreement by staying and performing the inventory. In a loud voice, Mr. Sales said he wanted the van. This occurred inside the store on the sales floor where there were people around. Employees were staring at Mr. Mendivil. Mr. Mendivil was shocked by Mr. Sales' loud demand for the keys to the van. He explained that he came to El Paso in the van and had no way to get back to Santa Fe. According to Mr. Mendivil, Mr. Sales' response was "Well, it's our van. And if you don't give me the van—if you don't give me the keys to the van, I'm going to call the police."

Mr. Mendivil pleaded with Mr. Sales to give him an hour to make transportation arrangements. Finally, Mr. Sales relented and agreed to the one-hour delay. Mr. Mendivil went to his mother's house and asked her to follow him back downtown so he could drop off the van. He told her that they were taking the van away from him. He also told her that he had to take it back now or else they would call the police.

Mr. Mendivil returned to the store, parked out front, and went inside to look for Mr. Sales. Mr. Sales inspected the van inside and out. While at his mother's house, Mr. Mendivil had prepared a receipt for Mr. Sales to sign stating that he had returned the company van in good order. Mr. Sales became angry when Mr. Mendivil asked him to sign the receipt. Mr. Sales began yelling and refused to sign anything. Mr. Mendivil told him that he would not give him the van unless he signed for it. Mr. Sales again threatened to call the police unless Mr. Mendivil gave him the keys. They were on the sidewalk in front of the store and passers by were witnessing the confrontation. Mr. Mendivil felt humiliated because Mr. Sales' threats made it seem as if he was robbing him. Mr. Mendivil's mother became embarrassed, very upset, and returned to her car and started crying. The confrontation lasted a few minutes before Mr. Mendivil decided to go inside the store to find an employee who could look at the van and confirm that it was in good condition. After the employee said it looked like a good van, Mr. Mendivil turned over the keys to Mr. Sales.

Mr. Mendivil returned home with his mother. He felt traumatized and thought it was outrageous to have to go through something like that. His mother was crying and he tried to calm her down. She was worried because Mr. Sales had said he

was going to call the police. He tried to reassure her that everything was going to be okay and not to worry. According to his mother, Mr. Mendivil looked very distraught and very pale after the incident.

The false statements about Mr. Mendivil being fired by Richard Rosen, Inc. continued after July 5. According to Mr. Garcia, six to eight weeks after July 1995, store managers continued to discuss their understanding that Mr. Mendivil had been fired. Henry Hinijosa, a store manager, heard that Mr. Mendivil had been fired from Mr. Rosen himself, possibly as late as February 1996.

Mr. Mendivil heard that he had been fired from acquaintances he met in Santa Fe and continued to hear the rumor for six to eight months as he applied for other positions in New Mexico. In networking for new employment, Mr. Mendivil contacted several sales representatives who had previously approached him after seeing what he had done for Richard Rosen, Inc. One of the companies was Western Warehouse, which operates several stores in New Mexico. In late July, Mr. Mendivil contacted their sales representative so that this contact could set up a meeting with upper management and let them know he was now available. The representative told Mr. Mendivil, "I heard that you had gotten fired." The representative did not want to set up the interview because he did not think they were going to be interested and also because they sold products to the company. Mr. Mendivil received similar responses from other sales representatives in New Mexico, including a jeans company, Laredo boots, and a hat salesman. Mr. Mendivil found that after his employment ended with Richard Rosen, Inc., no one would hire him and his sales representative contacts did not want to get involved and were no longer interested in him.

Felipe Martinez, a Santa Fe restaurant owner, testified that Mr. Mendivil was a patron of his business and a friend since 1993. In July 1995, Mr. Martinez heard that Mr. Mendivil had been fired from Delia Sandoval, a commercials sales representative for a Spanish television station. That same day, Mr. Mendivil showed up for lunch and Mr. Martinez told him that he heard he was fired. Mr. Mendivil looked distraught, unhappy, and a little upset about it. He walked out of the restaurant without taking his food or offering an explanation. Mr. Martinez stated that a lot of people were around when he heard that Mr. Mendivil had been fired. Mr. Mendivil testified that he also heard from the owner of Foxes, a restaurant in Santa Fe, that he had been fired. A bunch of people in that restaurant had also heard the rumor and when he entered one day, they were all discussing it. He tried to explain that he had resigned and was not fired.

Mr. Mendivil could not find employment in Santa Fe because it is a small community and no one would hire him because they thought he had been fired. Mr. Sales had promised him a recommendation letter when he gave his notice of resignation on June 10. Mr. Mendivil asked for one, but never received it. Mr. Mendivil felt that without a favorable recommendation, he was not going to get a job. Mr. Mendivil felt like he had been fired. He stayed in Santa Fe until the end of the year and then moved back to El Paso. He did not start working again until he started his own business in February 1996.

Mr. Mendivil failed in his attempts to collect the vacation pay and the bonus commission that Richard Rosen, Inc. owed him. A few days after the van incident, Mr. Mendivil met with Mr. Rosen, Mark Rosen, and Mr. Sales to discuss the money owed to him. Mr. Sales said the company

would give him his vacation pay if Mr. Mendivil signed a release of all other liability, which he refused to do. Mr. Sales also told Mr. Mendivil that in terms of the bonus, he had already been paid everything that was due. On February 20, 1996, Mr. Mark Rosen wrote a letter to Mr. Mendivil stating that the company was maintaining its position that the only amount owed to him was the vacation pay. According to the letter, the company had prepaid the fiscal year bonus to Mr. Mendivil[3] Mr. Mark Rosen's letter also accused Mr. Mendivil of threatening the company and reminded Mr. Mendivil that a trade secret violation was a third degree felony. In the letter, Mr. Mark Rosen threatened criminal prosecution for the alleged extortion and stated that they were "prepared to defend [their] position at all cost."

Mr. Mendivil denied ever having threatened Mr. Mark Rosen and during the conversation mentioned in the letter, Mr. Mendivil had only explained to Mr. Rosen why there was an overstock on certain merchandise in the stores. Mr. Mendivil found the letter to be outrageous and also took offense at a comment in the letter that Mr. Mendivil was the highest paid individual in the company because the company was again throwing that in his face. Kirk Sales testified that for a time, Mr. Mendivil was the highest paid in the company and conceded that they never paid him his vacation pay. According to Mr. Sales, the February 20 letter was a reply to Mr. Mendivil's request for money that they did not feel he deserved.

When Mr. Mendivil left the company on July 5, 1995, he was totally devastated.

He felt embarrassed, humiliated, very depressed, and unhappy. Mr. Mendivil was dazed and could not think clearly. He thought Mr. Sales treated him badly that day and thought what Mr. Sales had done to him was outrageous. Mr. Mendivil was also suffering because of the company's false statements about him being fired. He felt like he could not approach potential employers because everyone was repeating the rumor that he had been fired. Mr. Mendivil had hoped to make a nice clean break with the company but instead, he was not given time to network for a new job and was not given the recommendation that Mr. Sales had promised him. Mr. Mendivil felt devastated by the way it had ended. Mr. Mendivil also felt nervous because he had a continuing obligation for his son's college education costs. He felt like all of a sudden he had been blindsided.

With his reputation ruined and no good recommendation, Mr. Mendivil felt that there was no prospect of him obtaining a well-paying supervisory position. For this reason, he felt devastated and lost. He also felt like he was not going to be able to accomplish anything. On top of that, Mr. Mendivil felt stranded in Santa Fe. It was almost unbearable. The apartment that the company paid for in Santa Fe was leased in Mr. Mendivil's name. Richard Rosen, Inc. stopped paying the rent and Mr. Mendivil had to pay for the remaining months left on the lease. In the six months that followed, Mr. Mendivil could not sleep. His anguish affected his relationships with his girlfriend and his son. His girlfriend left him and his relationship with his son was strained because of the

---

**3.** The February 20 letter stated that Mr. Mendivil had been pre-paid his 1995 bonus in the amount of $12,700, however, Mr. Sales later testified that the company's controller had inadvertently overpaid the 1994 bonus to Mr. Mendivil from November to April 1995 in the amount of $18,500, which was to be applied against the 1995 bonus. Mr. Sales testified that he informed Mr. Mendivil of the bonus situation by letter dated April 27, 1995.

financial pressures he put on his son to finish college.

Mr. Mendivil sought psychological counseling in 1998. He did not seek help earlier because he was internalizing the pain and had never thought about seeing a professional. His attorney recommended Dr. Garry Feldman. Mr. Mendivil was embarrassed to see Dr. Feldman and never told anyone about the counseling. Dr. Feldman testified that Mr. Mendivil was suffering from moderate clinical depression. Dr. Feldman found that Mr. Mendivil's depression included physical symptoms like elevated blood pressure and cholesterol levels. Mr. Mendivil told Dr. Feldman that he felt "black-balled" by the "Rosens" because they had tainted his career opportunities by spreading rumors about him. Mr. Mendivil told the doctor that he was taking his frustrations out on his son and their relationship had became estranged. Mr. Mendivil felt shell-shocked, numb, and immobilized since the whole event. Mr. Mendivil also felt like a failure because of the way his former employer had treated him. Dr. Feldman determined with reasonable psychological probability that Mr. Mendivil's termination and falling out with the Rosen company was the major cause of his depression. The other events subsequent to the termination were contributing factors to that depression.

At trial, Mark Rosen testified that Mr. Mendivil was not fired from the company. He denied spreading rumors that Mr. Mendivil had been fired. He also denied telling anyone, including any prospective employers, that Mr. Mendivil had been fired. Mr. Sales disputed Mr. Mendivil's testimony concerning the effective date of his resignation. Mr. Sales recalled mentioning to Mr. Mendivil during the inventory process that the company had decided his leaving date would be July 1, but Mr. Mendivil made no response. Mr. Sales admitted that he had offered him a recommendation letter when Mr. Mendivil resigned and had thanked him for the advance notice. Mr. Sales stated that he found out that Mr. Mendivil was claiming that rumors were circulating through his June 30 letter to the company. On July 5, Mr. Sales faxed a memo to all stores, notifying the store managers that Mr. Mendivil had resigned and was no longer employed by the company effective that day. Mr. Sales agreed that a person's reputation in the retail merchandising industry was very important and that false statements about a high level manager's work reputation would be extremely damaging. Mr. Sales denied ever telling anyone in the company or out in the public that Mr. Mendivil was fired.

## DENIAL OF JNOV MOTION

In three issues, Appellant contends the trial court erred in denying the amended motion for JNOV because there is no evidence to support the jury findings on Mr. Mendivil's causes of action for intentional infliction of emotional distress and defamation and on the exemplary damages award.

### *Standard of Review*

We review a denial of a motion for JNOV under a legal sufficiency standard. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227–28 (Tex.1990); *Williams v. City of Midland*, 932 S.W.2d 679, 682 (Tex.App.-El Paso 1996, no pet.). In our review of a "no evidence" or legal insufficiency point, we review the evidence in the light most favorable to the jury's findings, considering only the facts and inferences that support them and disregarding all evidence and inferences to the contrary. *See Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If more than a scintilla of evidence supports the finding, the "no

evidence" point fails and the motion for JNOV was properly denied. *See Mancorp, Inc.*, 802 S.W.2d at 228; *Tseo v. Midland Am. Bank*, 893 S.W.2d 23, 25 (Tex.App.-El Paso 1994, writ denied). The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995).

When, as here, a party does not submit its affirmative defense to the jury, we review the record to determine whether the issue was disputed or whether the defense was conclusively established by the evidence as a matter of law. *See Whitney Nat'l Bank v. Baker*, 122 S.W.3d 204, 207 (Tex.App.-Houston [1st Dist.] 2003, no pet.); *see also Sterner v. Marathon Oil Company*, 767 S.W.2d 686, 690 (Tex.1989). A party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles. *Sterner*, 767 S.W.2d at 690. First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* Second, if there is no evidence to support the finding, then, the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.* Only if the contrary position is conclusively established will the point of error be sustained. *Id.* at 690–91.

### Intentional Infliction of Emotional Distress

In Issue One, Appellant asserts that even when viewing the evidence in the light most favorable to the jury's verdict, there is no evidence of extreme and outrageous conduct. Rather, as a matter of law, Appellant's conduct was not extreme and outrageous and thus, Mr. Mendivil failed to establish his intentional infliction of emotional distress claim.

To recover on an intentional infliction of emotional distress claim, a plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) that the resulting emotional distress was severe. *Hoffmann–La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex.2004); *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex.1999); *Dillard Department Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 404 (Tex. App.-El Paso 2002, pet. denied). Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Zeltwanger*, 144 S.W.3d at 445, *quoting Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993).

To determine whether certain conduct is extreme and outrageous, we consider the context and the relationship between the parties. *See GTE Southwest, Inc.*, 998 S.W.2d at 612; *Tiller v. McLure*, 121 S.W.3d 709, 714 (Tex.2003)(per curiam). A claim for intentional infliction of emotional distress does not lie for ordinary employment disputes. *GTE Southwest, Inc.*, 998 S.W.2d at 612. Thus, to establish the cause of action in the workplace, an employee must prove the existence of some conduct that brings the dispute outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous conduct. *Id.* at 613. Likewise, post-termination conduct may constitute intentional infliction if it goes "beyond all possible bounds of decency," but "ordinary" post-termination disputes are insufficient to support liability. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 817 (Tex.2005). When repeated or ongoing severe harassment is shown, the conduct

should be evaluated as a whole in determining whether it is extreme and outrageous. *GTE Southwest, Inc.,* 998 S.W.2d at 616.

 It is for the court to determine, in the first instance, whether a defendant's conduct was extreme and outrageous. *GTE Southwest, Inc.,* 998 S.W.2d at 616. But when reasonable minds may differ, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct was sufficiently extreme and outrageous to result in liability. *Id.*

 Mr. Mendivil argues that when all the evidence and surrounding circumstances are considered as a whole, the evidence was legally sufficient to permit a reasonable jury to find that Appellant committed intentional infliction of emotional distress. He relies upon the following evidence to support his claim that Appellant engaged in a course of conduct that was extreme and outrageous:

(1) Around July 1, Mr. Mendivil heard rumors that he had been fired from other employees, some of whom reported hearing the rumor from Mr. Richard Rosen;

(2) On July 5, Mr. Rosen told the Alamogordo store manager that Mr. Mendivil had been fired;

(3) The company told Mr. Mendivil to travel down to El Paso for a meeting without telling him what the meeting was about;

(4) The company knew that Mr. Mendivil lived in Santa Fe and knew that he would travel down to El Paso in the company van, which they also knew was his only transportation, but never warned him that they intended to take away the van and leave him stranded far from home;

(5) When Mr. Mendivil arrived in El Paso, Mr. Sales immediately demanded the company van, speaking loudly to him in public and threatening to call the police;

(6) After granting the one-hour delay which Mr. Mendivil had to beg for, Mr. Sales refused to sign a return receipt, yelled at Mr. Mendivil in front of passersby, threatened to call the police, and made Mr. Mendivil's mother cry;

(7) After July 5, Mr. Mendivil continued to hear false statements that he had been fired for six to eight months from prospective employers;

(8) Even as late as February 1996, Richard Rosen reported the false statement to a store manager;

(9) Mr. Sales refused to give Mr. Mendivil the recommendation he had promised;

(10) The company failed to pay Mr. Mendivil his vacation pay and the bonus he had earned; and

(11) When Mr. Mendivil attempted to collect the money owed to him, Mr. Mark Rosen told him that the company would defend their position 'at all cost,' accused Mr. Mendivil of extortion and attempted blackmail, and threatened to have Mr. Mendivil prosecuted for the 'third degree felony' of 'unauthorized taking, copying, or communication of the company's trade secrets.'

 In considering the legal sufficiency of Mr. Mendivil's emotional distress claim, we are mindful that the Texas Supreme Court was recently reiterated that "intentional infliction of emotional distress is a 'gap-filler' tort never intended to supplant or duplicate existing statutory or common-law remedies." *Creditwatch,*

**194**

*Inc.,* 157 S.W.3d at 816; *see also Zeltwanger,* 144 S.W.3d at 447. In his brief, Mr. Mendivil includes facts related to Appellant's alleged defamatory conduct as evidence to support his emotional distress, as we have noted above. However, under the current law in Texas, Mr. Mendivil cannot recover under this gap-filler tort where the same actions that form the basis of his defamation claim are asserted to support his independent tort claim for intentional infliction of emotional distress. Since this issue was not raised below, it is not properly before us.[4]

■■■ After reviewing the evidence as a whole and in the light most favorable to the jury's verdict, we find that Appellant's conduct, whether excluding or including the defamatory-related conduct, does not rise to the level of extreme and outrageous conduct sufficient to meet the exacting requirements of an intentional infliction of emotional distress claim. *See Creditwatch, Inc.,* 157 S.W.3d at 816. Rude behavior does not equate to outrageousness, and behavior is not outrageous simply because it is tortious. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994). While representatives of the company treated Appellant rudely, insensitively, verbally threatened him, and, as alleged by Mr. Mendivil, defamed his reputation, this conduct simply does not rise to the level of outrageousness necessary to establish the tort. *See GTE Southwest, Inc.,* 998 S.W.2d at 612 ("[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct."); *see e.g., Tiller,* 121 S.W.3d at 714–15 (defendant's callous, insensitive, and rude behavior as well as his breach of contract in the

parties' commercial dispute did not rise to the level of extreme and outrageous conduct); *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex. 1998)(per curiam)(manner of termination was not extreme and outrageous conduct where employer fired plaintiffs in the presence of coworkers, forced them to collect and remove their belongings in front of others, and immediately took steps to repossess car phones owned by the employer); *Wornick Co. v. Casas,* 856 S.W.2d 732, 735 (Tex.1993)(manner of termination was not extreme and outrageous conduct where employee was suddenly fired, given no explanations, was told to leave immediately, was escorted off the premises by a security guard, and was never given a promised post-termination meeting); *Diamond Shamrock Ref. & Mktg. Co. v. Mendez,* 844 S.W.2d 198, 202 (Tex.1992)(falsely depicting in the community that an employee is a thief is not sufficiently outrageous conduct to support a claim). Appellant's conduct simply was not so extreme as to bring Appellant's conduct outside the scope of an ordinary employment dispute nor did it "go beyond all possible bounds of decency" as to be "atrocious, and utterly intolerable in a civilized community." *See Zeltwanger,* 144 S.W.3d at 445; *GTE Southwest, Inc.,* 998 S.W.2d at 613. We conclude there is no evidence to support this essential element of Mr. Mendivil's claim for intentional infliction of emotional distress. Moreover, the record conclusively establishes that Appellant's conduct was not extreme and outrageous. Because the evidence is legally insufficient to support the emotional distress claim, we sustain Issue One.

4. In post-submission letter briefs filed after oral argument, both parties agree that a "gap filler" tort issue was not raised at trial and was not briefed on appeal. *See Zeltwanger,* 144 S.W.3d at 450 (finding "gap-filler" argument not waived where raised in defendant's motion for judgment non obstante veredicto).

## Defamation

In Issue Two, Appellant contends that Mr. Mendivil cannot establish that it defamed him because there was no evidence that Mr. Richard Rosen communicated the false statement that Mr. Mendivil had been fired to anyone outside the company or that this false statement was not received by a corporate employee in the course and scope of their duties for the company. In effect, Appellant is contending that the defamatory statements were subject to its affirmative defense of qualified privilege.

██ Slander is a defamatory statement that is orally communicated or published to a third person without legal excuse. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995). A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury. Tex.Civ.Prac. & Rem. Code Ann. § 73.001 (Vernon 2005); *Austin v. Inet Technologies, Inc.,* 118 S.W.3d 491, 496 (Tex.App.-Dallas 2003, no pet.).

██ A corporation may be held liable for defamation by its agent if such defamation is referable to the duty owing by the agent to the corporation and was made in the discharge of that duty. *Texam Oil Corp. v. Poynor,* 436 S.W.2d 129, 130 (Tex.1968); *Wal–Mart Stores, Inc. v. Lane,* 31 S.W.3d 282, 288 (Tex.App.-Corpus Christi 2000, pet. denied). A corporation may also be held liable for tortious acts of a vice-principal of the corporation. *Lane,* 31 S.W.3d at 288. A vice-principal is a corporate officer, a person with authority to employ, direct, and discharge servants of the master, or a person with whom the master has confided the management of the whole or part of a department or division of the business. *Id.*

██ Legal excuse for defamation includes the defense of qualified privilege. *Hanssen v. Our Redeemer Lutheran Church,* 938 S.W.2d 85, 92 (Tex.App.-Dallas 1996, writ denied). A qualified privilege attaches to bona fide communications, on a subject in which the speaker has an interest or duty to another person having a corresponding interest or duty. *See TRT Dev. Co.-KC v. Meyers,* 15 S.W.3d 281, 286 (Tex.App.-Corpus Christi 2000, no pet.); *Hanssen,* 938 S.W.2d at 92, *citing Dixon v. Southwestern Bell Tel. Co.,* 607 S.W.2d 240, 242 (Tex.1980); *Martin v. Southwestern Elec. Power Co.,* 860 S.W.2d 197, 199 (Tex.App.-Texarkana 1993, writ denied). This privilege is termed conditional or qualified because a person availing himself of it must use it in a lawful manner and for a lawful purpose. *Hanssen,* 938 S.W.2d at 92. Similarly, a conditional or qualified privilege attaches to employer communications made in the course of an investigation following a report of employee wrongdoing. *Randall's Food Markets,* 891 S.W.2d at 646. The privilege remains intact as long as communications pass only to persons having an interest or duty in the matter to which the communications relate. *Id.* Proof that a statement was motivated by actual malice existing at the time of publication defeats the privilege. *Id.* When the facts are undisputed and the language used in the publication is not ambiguous, the question of privilege is ordinarily a question of law. *See TRT Dev. Co.-KC,* 15 S.W.3d at 286; *Dixon,* 607 S.W.2d at 241.

██ Appellant contends that it established its qualified privilege defense because there was no direct evidence that company employees communicated the false statement to anyone outside the company, rather Mr. Richard Rosen communicated the false statement solely to his employees. In so arguing, Appellant relies

on *Mars, Inc. v. Gonzalez*, 71 S.W.3d 434, 437 (Tex.App.-Waco 2002, pet. denied), which Appellant argues establishes a "test" for holding a corporate entity guilty of libel for its agents acts. In *Mars, Inc.*, an employee sued his employer for libel based on mass distribution of allegedly defamatory statements through the employer's e-mail system. *Mars, Inc.*, 71 S.W.3d at 436. Under the jury charge given in that case, the *Mars, Inc.* court stated that to hold Mars guilty of libel, there must be evidence that: (1) an agent of Mars; (2) acting "on behalf of the corporation" (in the course and scope of their duties for Mars); (3) communicated a false statement; (4) to a person (a) other than a Mars employee or (b) to a Mars employee whose course and scope of their duties for Mars did not require receipt of the false communication; (5) and that communication proximately caused; (6) damages to Gonzalez. *Mars, Inc.*, 71 S.W.3d at 437. On its face, it appears that the test espoused in *Mars, Inc.* was limited to the particular facts of that case and the *Mars, Inc.* court's sufficiency review was based on the particular charge given to the jury. Therefore, we find the *Mars, Inc.* test instructive, but not dispositive in our review of Appellant's asserted qualified privilege defense.

Appellant concedes that Mr. Rosen, as owner of Richard Rosen, Inc., was an agent of the corporation. Appellant also concedes that Mr. Rosen's statements to store managers Mr. Garcia and Mr. Hinijosa that Mr. Mendivil had been fired were false. Instead, Appellant argues that these false statements were not made to anyone outside the company, but rather were made only to employees who were required to receive the false communication in the course and scope of their duties for the company. Specifically, Appellant argues that Mr. Garcia and Mr. Hinijosa worked closely with Mr. Mendivil in managing the stores, delivery of goods, and remodeling, therefore these employees were within the circle of company employees whose course and scope of duties required receipt of the communication from Mr. Rosen. According to Mr. Mendivil, by July 1, he had begun to hear rumors that he had been fired and several store employees told him that they received the news from Mr. Rosen himself. Mr. Garcia testified that Mr. Rosen called him on July 5 and told him that Mr. Mendivil had been fired. Even assuming that Mr. Rosen made this communication out of an interest and duty to report Mr. Mendivil's alleged termination to a fellow coworker who held a corresponding interest in the information for purposes of managing the store, there was some evidence that Mr. Rosen made the false statement to Mr. Hinijosa several months after Mr. Mendivil's employment had ended. Due to a prior dispute between Mr. Hinijosa and Mr. Mendivil in May 1995, Mr. Mendivil was no longer Mr. Hinijosa's immediate supervisor. Thus, there was no business reason for Mr. Rosen to communicate the false statement to Mr. Hinijosa under Appellant's defense theory. Because there is some evidence that Mr. Rosen communicated the defamatory statement to a company employee who did not have an interest or duty with regard to the information, Appellant cannot conclusively establish its qualified privilege defense as a matter of law.

In addition to the evidence discussed above, Mr. Mendivil testified that in late July, he heard that he had been fired from sales representatives who did business with Appellant. During the same period, Mr. Martinez, a Santa Fe restaurant owner, heard that Mr. Mendivil had been fired from Delia Sandoval, a commercials sales representative for a Spanish language television station. Mr. Mendivil testified that another local restaurant owner also told

him that she had heard he was fired by Appellant. According to Mr. Mendivil, Santa Fe is a small community and everyone soon knew the rumors.

Viewing the evidence in the light most favorable to the verdict, we find that the jury could have reasonably inferred that Appellant was the source of the false statements about Mr. Mendivil. Although Mr. Sales attempted to dispel rumors that Mr. Mendivil had been fired by issuing a formal statement notifying all store managers that Mr. Mendivil had resigned, Mr. Rosen continued to tell company employees Mr. Mendivil had been fired. A sales representative from a distributor who did business with Appellant also heard the same false statement. Because there is more than a scintilla of evidence to support the jury's finding that Appellant published defamatory statements about Mr. Mendivil, we conclude there was legally sufficient evidence to support the defamation claim. Issue Two is overruled.

### Exemplary Damages

■ In its third issue, Appellant contends the trial court erred in denying its amended JNOV on the award of exemplary damages. Appellant asserts that exemplary damages award must be reversed because it was predicated on the award of actual damages for the intentional infliction of emotional distress claim.

■ As we concluded in our disposition of Issue One, there was legally insuf-

ficient evidence to support the jury's finding on Mr. Mendivil's emotional distress claim. An award of actual damages is necessary to support an award of punitive damages. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 667 (Tex.1990). However, in this case, the charge given to the jury instructed it to measure exemplary damages based on the conduct found in response to an affirmative finding of liability under Question 2 (an affirmative malice finding predicated on an affirmative finding on the emotional distress claim) or Question 4 (an affirmative finding on the defamation claim). There is nothing in the jury charge that limits the exemplary damages question to only the emotional distress claim.[5] Because Mr. Mendivil is entitled to recover actual damages on the defamation claim, the award of punitive damages is adequately supported. Issue Three is overruled.

Because Mr. Mendivil's claim for defamation was supported by legally sufficient evidence, we affirm the portion of the trial court's judgment awarding Mr. Mendivil $100,000 for his defamation claim and $25,000 in exemplary damages. However, because the evidence was legally insufficient to support the jury's finding that Appellant intentionally inflicted emotional distress upon Mr. Mendivil, we reverse that portion of the trial court's judgment on the emotional distress claim, and ren-

5. Although the issue is not raised by either party directly, we observe that the jury charge in this case was defective in that the exemplary damages question as to the defamation claim was not correctly conditioned on an affirmative finding of malice. While Mr. Mendivil may have intended that Question 2, the malice question, be applied to both liability claims, a literal reading of the jury charge indicates that Question 2 was solely predicated on an affirmative finding to Question 1, the

intentional infliction of emotional distress claim. Appellant raised no objection to the jury charge at the formal charge conference. Since Appellant failed to preserve the issue of the omitted predicate malice finding for the punitive damages award on the defamation claim, it cannot complain of the error on appeal. *See* Tex.R.Civ.P. 278 (an objection suffices to preserve error concerning trial court's failure to submit a jury question upon which the opposing party relies).

der judgment that Mr. Mendivil take nothing on that damage claim only.